IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

TAD MCKINNEY,

                    Petitioner,

        v.                                             Civil Action No.
                                                       9:04-CV-1150 (FJS/DEP)

JOHN W. BURGE, Superintendent,
  Auburn Correctional Facility,

                    Respondent.

APPEARANCES:                          OF COUNSEL:

FOR PETITIONER:

TAD MCKINNEY, *Pro Se*

FOR RESPONDENT:

HON. ANDREW M. CUOMO           MICHELLE ELAINE MAEROV, ESQ.
Office of the Attorney General  Ass't Attorney General
120 Broadway
New York, NY 10271

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

        *Pro Se* petitioner Tad McKinney, a New York State prison inmate

as a result of a 2001 conviction for burglary, grand larceny and petit

larceny, has commenced this proceeding seeking federal habeas

intervention on his behalf, pursuant to 28 U.S.C. § 2254.  In his habeas

petition, McKinney raises several grounds most, though not all, of which

were previously raised by him in the state courts and rejected, arguing,

*inter alia,* that the trial court improperly denied his application to suppress

certain statements by him to law enforcement, the prosecution failed to

provide him with exculpatory material in violation of his rights under

*Brady v. Maryland,* 373 U.S. 83, 83 S. Ct. 1194 (1963), and he was

denied effective representation by his trial and appellate counsel.  Having

reviewed McKinney's petition, which the respondent has opposed, in light

of the deferential standard owed to the findings of the state courts with

respect to his claims, I recommend that the petition be denied.

I.    <u>BACKGROUND</u>

Petitioner's conviction stems from his participation in a string of

burglaries that took place in the Syracuse University vicinity between

April and June of 2000.  During that time period, petitioner lived with his

wife in Apartment 1004 at 80 Presidential Plaza, in the City of Syracuse.

Transcript of Trial (June 4, 5,6,7, 2001)("Trial Tr.") at 521, 616-17.

Following petitioner's confession to law enforcement investigators

to having committed the burglaries and the recovery of some of the

stolen property from individuals who had received the recovered items from the petitioner, McKinney was indicted by an Onondaga County grand jury and charged with second degree burglary (four counts), third degree burglary, fourth degree grand larceny (four counts) and petit larceny (three counts).  Prior to the scheduled commencement of trial on those charges, a *Huntley/Wade*[1] hearing was held on March 23 and 26, 2001 by the assigned trial judge, Onondaga County Court Judge Anthony F. Aloi.  Following that hearing, Judge Aloi denied petitioner's motion to suppress photographic identifications made by two witnesses, Mark Perry and Teddy Johnson, finding that the photographic arrays at issue were displayed to them in a non-suggestive manner.  *See* Transcript of Hearing (Mar. 23, 2001)("Mar. 23 Hrg. Tr."), at 27-33.  In a decision and order dated March 30, 2001, Judge Aloi also denied petitioner's motions to suppress his statements to police investigators.  *See* Dkt. No. 10, Exh. 3b ("Opinion").

A separate hearing was held on June 1, 2001 to determine the validity of consent given by petitioner's wife, Elizabeth McKinney, authorizing a search of the couple's apartment.   As a result of that

---

[1]      *U.S. v. Wade*, 338 U.S. 218, 388 S. Ct. 1926 (1967); *People v. Huntley*, 15 N.Y.2d 72, 204 N.E.2d 179, 255 N.Y.S.2d 838 (1965).

hearing Judge Aloi determined that Mrs. McKinney's consent was freely and voluntarily given, and accordingly declined to suppress the fruits of that search.[2]  *See* Transcript of Consent Hearing, at 39.

A jury trial was conducted by Judge Aloi, beginning on June 4, 2001, to address the charges lodged against the petitioner.  The evidence adduced during the trial established that the first of the five burglaries with which petitioner was charged took place at 133 Circle Road, a residence occupied by Donald DeSalvia and his family. *See* Trial Tr. at 410-11, 583-84.  On April 21, 2000, at approximately 12:30 a.m., Mark DeSalvia arrived at the family's home, and did not notice anything unusual.  Trial Tr. at 410-11.  The next morning, Mark and Donald DeSalvia noticed that the front door to the porch was open, the garage door was open, and there was bread and baloney left out on the counter. Trial Tr. at 411, 583.  A VCR, a set of earphones, a compact disc ("CD") player, a computer bag with a laptop and programs, $800 cash, $900 in American Express travelers checks, a bag with a digital camera, sneakers, and a jacket were all determined by the DeSalvias to be missing.  Trial Tr. at 411, 583-84.  Donald DeSalvia identified a trial

---

[2]    In this proceeding petitioner does not challenge the validity of Judge Aloi's findings with respect to either the *Wade* hearing or the consent hearing.

exhibit as one of the stolen traveler's checks, bearing his name.  Trial Tr. at 584-85.  Mark DeSalvia's 1978 Ford Bronco, valued at between one and two thousand dollars, was also discovered to be missing from the driveway of the residence.  Trial Tr. at 411-13.  The stolen vehicle was located the next day in the 900 block of South Townsend Street in Syracuse.  Trial Tr. at 438-39.  No one, including petitioner, had permission to enter the house or to take any of the missing items.  Trial Tr. at 412, 584-85.

The second and third subject burglaries took place on May 23, 2000, the first of those occurring at a home located at 543 Cumberland Avenue, in Syracuse.  Trial Tr. At 428-30.  At 2:00 a.m. on that date Barbara Curran, who lived alone at the residence, awoke with leg cramps and went downstairs to retrieve some aspirin.  *Id.*  During the process, she discovered that the lights were on, the cellar door was open, and the shades were pulled.  *Id.*  The victim's purse, two cell phones, a walkman and a camera were ultimately determined to be missing.  *Id.*  The next day, outside of her home Curran discovered a beer bottle that matched the brand kept in her refrigerator; the victim subsequently turned the bottle over to investigating officers.  Trial Tr. at 433-34.  No one, including

5

petitioner, had permission to enter Curran's home or to take the missing items.  Trial Tr. at 434.  At trial, Curran identified a trial exhibit as one of the cell phones taken from her home.  Trial Tr. at 433-34.

The second May 23, 2000 burglary took place at 1011 Westcott Street, at the home of Barry and Eleanor Lentz.  Trial Tr. at 510-11.  At approximately 4:30 a.m., Eleanor Lentz awoke to discover that the dining room window and refrigerator doors were open; the back door was also found to be ajar, and the screen door had been propped open with a bucket.  Trial Tr. at 511.  The Lentz's family cat was found coming in and out of the open window.  Id.  Upon investigation, it was determined that the children's two backpacks and Eleanor Lentz's briefcase were missing, along with money from Barry Lentz's wallet, and twenty-three CDs.  Trial Tr. at 512-15.  One of the missing backpacks was later discovered in a neighbor's yard.  Trial Tr. at 515.  Lentz identified a trial exhibit as his wife's briefcase.  Id. at 513.  No one had permission to enter the home or take the missing items.  Trial Tr. at 514.

The fourth burglary in issue took place on May 31, 2000 at the home of Michael Grygus, located at 856 Maryland Avenue in Syracuse. When Grygus awoke, he discovered strawberries out on the kitchen

6

counter, and that the window and back door were open.  Trial Tr. at 457-58.  The victim also found that his CD player, wallet, camcorder, calculator,  the drive to his laptop computer, and several bottles of beer were all missing.  Trial Tr. at 458-59.  In his backyard, Grygus found a bag containing CDs and work papers.  *Id.* at 459.  At trial, Grygus identified a trial exhibit as his calculator and the drive to his laptop computer.  *Id.* at 460.  No one had permission to enter Grygus's home or take the missing items.  *Id.* at 459.

The last burglary took place on June 7, 2000 at 732 Ostrum Avenue, a two-story building owned by Syracuse University and used by the college's Psychology Department.  Trial Tr. at 498-99.  Some of the rooms located within the building give the appearance of being a day care center, with children's drawings hung on the walls and dolls available for children to play with.  *Id.* at 499-500. On the morning following the burglary, Carlos Panahon, a graduate psychology student, arrived at the dwelling for a morning appointment and discovered computer equipment on the floor, and that doorknob on the door leading from the kitchen to the main hallway was broken.  *Id.* at 500, 502.  Panahon noticed that other computer equipment and a camcorder were

missing, along with a radio and a locked metal box containing between $500 and $1,000.  Trial Tr. at 501-502.

Teddy Johnson, one of the witnesses at trial, testified that he and the petitioner began using drugs together in 2000, and that McKinney would occasionally knock on his door and give him things to sell. Trial Tr. at 478-79.  When that occurred, McKinney told Johnson he had obtained the items from the University area.  Trial Tr. at 479-80.  On one occasion in May of 2000, Johnson helped petitioner cash a traveler's check, stolen from 133 Circle Avenue, at the M & M market at 140 Oakwood Avenue in the City of Syracuse.  Trial Tr. at 420-21, 480-82.  Marwazi Azzam, the owner of that business, confirmed that Johnson and another man came into his store at or about that time, and that he cashed a $100 traveler's check for the man because Johnson, a regular customer, had vouched for his companion.  Trial Tr. at 420-22.  When Azzam was notified by the bank that the check was stolen, he contacted law enforcement officials, gave them a copy of the check, and provided them with Johnson's name. Trial Tr. at 421.  Trial Tr. at 423.  Azzam identified the check earlier confirmed by Donald DeSalvia as having been stolen from his home on April 21, 2000 as the check he cashed for Johnson and his companion.

8

Trial Tr. at 423.

Johnson also testified to once witnessing the petitioner break open a strong box and remove envelopes containing money from inside. Trial Tr. at 482. Petitioner told Johnson he obtained the box from a daycare center. *Id.* at 482, 492-93. Johnson sold the box, along with two bracelets and a ring, to petitioner's wife. Trial Tr. at 495-96, 616-17. At trial, Panahon identified the lockbox as that which had been taken from 732 Ostrum Avenue. *Id.* at 503. Michael Douglas, who is affiliated with the Department of Psychology at Syracuse University, also identified the box and provided police with the key. Trial Tr. at 641-42, 647, 652-54.

On June 20, 2000, Syracuse City Police Detective Edward MacBlane transported the petitioner to the department's Criminal Investigations Division (CID) offices where he administered petitioner his *Miranda* rights and petitioner signed a *Miranda* rights waiver form.[3] Trial Tr. at 519-20, 646-47, 657. At that time, police officials were investigating between fifteen and fifty residential burglaries in the University area. Trial Tr. at 646-47. Upon initial questioning, petitioner denied any involvement in those burglaries. *Id.* at 658. Detective

---

[3]     *Miranda v. Arizona,* 384 U.S. 436, 86 S. Ct. 1602 (1966).

MacBlane turned the interview of petitioner over to Detectives Steven Stonecypher and Mark Abraham at approximately 7:00 p.m.  Trial Tr. at 519-20.  For the first hour of the ensuing interview session, petitioner talked about himself and his background, and advised Stonecypher that he wanted to assist law enforcement by writing a book and by talking to police academy students about how he executed burglaries in order to educate them and to prevent future crimes.  Trial Tr. at 553-54, 560.

Stonecypher asked the petitioner about the University-area burglaries, which he termed "incidents."  Trial Tr. at 519.  Petitioner responded, "[l]et's not call them incidents, and let's call them what they are.  They are burglaries."  *Id.* at 519-20.  Petitioner told Stonecypher that he lived at Presidential Plaza, and that when he wanted to commit burglaries, he chose a neighborhood close to home.  He explained that he would go into the University area and look for houses that had open windows and doors, which McKinney stated that he would use to access the homes.  *Id.* at 539-40.  If the windows had screens, McKinney stated that he would cut them and lift them out so that he could climb in through the window.  *Id.*  at 540.  Once inside, petitioner said that he would wait a few minutes to be certain no one was home or awakened by his intrusion,

and would then prop open outside doors to make an easy exit for himself when he was finished with the burglary. *Id.* at 540, 559.

Petitioner told Stonecypher that at one of the burglaries, a motion light came on and startled him, causing him to stand and watch a cat climb into the open window.  Trial Tr. at 552.  Petitioner explained that while inside the houses, he would eat and drink because "a man needed fuel."  Trial Tr. at 552.  McKinney stated that some of the property which he took from the homes was sold by him at Presidential Plaza.  *Id.* at 553.  Petitioner admitted having taken a VCR during the course of one of the burglaries.  *Id.*

Up until that point in the interrogation, petitioner did not list specific addresses of the homes which he burglarized, nor did he detail the items taken or the food eaten during the course of those crimes.  Trial Tr. at 559-61, 564-68.  Petitioner spoke to his mother during the interview and, based on her advice, told Stonecypher that he would provide him with specific information, including the locations of the burglaries, after he rested.  Trial Tr. at 553-54.  The interview ceased, and at approximately 6:00 a.m., Stonecypher took petitioner to be booked on a parole warrant, and did not speak with him after that.  Trial Tr. at 554.

11

On June 30, 2000, Detective Eric Carr went to Hans Klint's apartment at Presidential Plaza as part of the burglary investigation. Trial Tr. at 610-11.  With Klint's permission, Carr recovered two calculators, coins, a blue carry bag, a camera, and a disc drive for a computer.  *Id.* at 613-14. Petitioner's identification was found inside the blue bag, later confirmed to be that which was taken from the Lentz residence.  *Id.* at 614.  Detective Carr also recovered a VCR from Rosa Smith, who told Carr she bought it from petitioner for $20.00.  Trial Tr. at 617.

On June 27, 2000, Detective Carr spoke to Julio Diaz, who also lived at Presidential Plaza, and recovered a cell phone.  A check of the serial number on the phone confirmed that it belonged to Barbara Curran's son, and was one of the phones taken from Curran home during the May 23, 2000 burglary.  Trial Tr. at 433-34, 644-47.  Michael Grygas identified one of the calculators and the computer drive as those taken from his home during the May 31, 2000 burglary.  Trial Tr. at 460-61, 649-50.  Eleanor Lentz identified the blue bag as one taken from her home.  Trial Tr. at 642.

Petitioner's wife, Elizabeth McKinney, and his niece, Sarah

12

Lethbridge, testified for petitioner during his trial.  Elizabeth McKinney testified that on June 20, 2000, she permitted police to enter the apartment which she shared with her husband because she was afraid that if she did not cooperate she would be arrested. Trial Tr. at 673-75. Mrs. McKinney testified that she was asked to provide the investigating agents with two bracelets, a blue ring and a metal box all of which were believed to be stolen.  *Id.* at 674.  Petitioner's wife did not believe the items were stolen because she bought them from Teddy Johnson two days earlier for $10.00.  *Id.* at 675-76.  Mrs. McKinney told police that Johnson and Hans Klint regularly picked through garbage, and that Johnson said he retrieved the box from the trash.  *Id.* at 678-79. Petitioner's wife claimed that between April and June of 2000, petitioner left the house "maybe twice." *Id*. at 693.  On three occasions, Mrs. McKinney remembered that petitioner went to the nearby gas station, and claimed that on April 23, May 21, and June 5, 2000, petitioner was home babysitting his niece, Sarah Lethbridge.  *Id.* at 693-96; 702-704.

During her testimony McKinney's niece, Sara Lethbridge, recalled spending every Tuesday and Friday night between April and June, 2000 with petitioner and his wife at their home.  Trial Tr. at 702-08.  She

testified that she saw petitioner at home each time she stayed there, that she slept on the couch, and that while there she was never awakened by petitioner entering or exiting the apartment.  *Id.*

At the close of his trial, petitioner was convicted of four counts of second degree burglary, two counts of fourth degree grand larceny, and three counts of petit larceny.  Trial Tr. at 876.  The jury acquitted petitioner of charges in connection with the 732 Ostrum Avenue burglary, and a fourth degree grand larceny count relating to the theft of Mark DeSalvia's 1978 Ford Bronco.  *Id.*  Based upon the jury's verdict, petitioner was sentenced on July 12, 2001 as a persistent violent felony offender principally to an aggregate indeterminate term of incarceration of between twenty years and life.  *See* Transcript of Sentencing (7/2/01)("Sent. Tr.") at 40-42.

II.    PROCEDURAL HISTORY

A.    State Court Proceedings

Petitioner appealed his conviction to the New York State Supreme Court, Appellate Division, Fourth Department.  In a brief filed in connection with that appeal by his appellate counsel, petitioner argued that 1) his statement should have been suppressed; 2) the evidence was

legally insufficient to support his conviction, which was against the weight of the evidence; 3) the trial court erred when it permitted petitioner to represent himself at sentencing; 4) the trial court erred when it denied petitioner's motion for a mistrial; 5) the sentence imposed was excessive, and in violation of the Eighth Amendment. *See* Dkt. No. 10, Exh. 3c; Brief in Support of Appeal ("App. Br.") at 26-62. In a supplemental brief filed by the petitioner, *pro se,* McKinney raised several additional grounds for reversal, asserting that 1) the trial court erred when it failed to issue a missing witness jury instruction; 2) petitioner's motion to sever the offenses joined in the indictment returned against him should have been granted; 3) the trial court's *Sandoval* ruling was prejudical;[4] 4) the prosecution failed to provide him with exculpatory evidence in its possession; and 5) he did not receive effective trial or appellate counsel. *See* Dkt. No. 10, Exh. 3c, Pro Se Supplemental Brief ("Pro Se Supp. Br.").

On February 7, 2003, the Fourth Department vacated the sentences imposed on the two grand larceny convictions but otherwise unanimously affirmed petitioner's conviction, remitting the case to

---

[4]   *People v. Sandoval,* 34 N.Y.2d 371, 314 N.E.2d 413, 357 N.Y.S.2d 849 (1974).

Onondaga County Court for re-sentencing on the grand larceny counts. *People v. McKinney*, 302 A.D.2d 993, 755 N.Y.S.2d 541 (4th Dep't. 2003).[5]   Leave to appeal that court's decision to the New York State Court of Appeals was subsequently denied on July 7, 2003.  *People v. McKinney*, 100 N.Y.2d 584, 764 N.Y.S.2d 395 (2003).

B.    Proceedings in this Court

Petitioner commenced this proceeding on October 7, 2004.  Dkt. No. 1.  Appropriately named as the respondent in McKinney's petition is John W. Burge, the superintendent of the prison facility in which he was housed at the time of filing.  *Id.*  In support of his quest for habeas relief, petitioner argues that 1) his statement to police officials were coerced; 2) the prosecution improperly withheld exculpatory material from him; 3) the evidence adduced at trial was legally insufficient to support his convictions; 4) his trial and appellate counsel were ineffective; and 5) the sentence imposed was excessive and constituted cruel and unusual punishment.  *Id., see also* Dkt No. 18.

---

[5]       Although petitioner claims that he was re-sentenced on the grand larceny convictions to an indeterminate term having a minimum of two years and a maximum of four years (Dkt. No. 1, at Ground Six), I am unable to confirm that information in light of the lack of anything in the record reflecting the outcome of the re-sentencing on those convictions.

On March 17, 2005, the Office of the Attorney General for the State of New York, acting on respondent's behalf, filed a response to McKinney's petition, accompanied by a legal memorandum and various of the relevant state court records and transcripts.  Dkt. Nos. 10 & 11. Petitioner subsequently filed a reply memorandum, or "Traverse", on August 31, 2005.  Dkt. No. 18.  The matter, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).  *See also* Fed. R. Civ. P. 72 (b).

III.     DISCUSSION

A.     Standard of Review

Enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), brought about significant new limitations on the power of a federal court to grant habeas relief to a state court prisoner under 28 U.S.C. § 2254.  Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre*, 246 F.3d

76, 88 (2d Cir. 2001) (quoting § 2254(e)(1)) (internal quotes omitted).

Significantly, a federal court may not grant habeas relief to a state

prisoner on a claim

> that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim –
>
>> 1) resulted in a decision that was
>> contrary to, or involved an
>> unreasonable application of, clearly
>> established Federal law, as
>> determined by the Supreme Court of
>> the United States; or
>>
>> 2) resulted in a decision that was
>> based on an unreasonable
>> determination of the facts in light of
>> the evidence presented in the State
>> court proceeding.

28 U.S.C. § 2254(d); *see also Thibodeau v. Portuondo*, 486 F.3d 61, 65

(2d Cir. 2007); *Noble v. Kelly*, 246 F.3d 93, 98 (2d Cir.), *cert. denied*, 534

U.S. 886, 122 S. Ct. 197 (2001); *Boyette*, 246 F.3d at 88.  When

applying this test, the Second Circuit has noted that

> [u]nder AEDPA, we ask three questions to
> determine whether a federal court may grant
> habeas relief: (1) Was the principle of Supreme
> Court case law relied upon in the habeas petition
> "clearly established" when the state court ruled?
> (2) If so, was the state court's decision "contrary
> to" that established Supreme Court precedent?
> (3) If not, did the state court's decision constitute

18

an "unreasonable application" of that principle?

*Williams v. Artuz*, 237 F.3d 147, 152 (2d Cir. 2001), *cert. denied* 534 U.S. 924, 122 S. Ct. 279, 151 L.Ed. 205 (2001) (citing *Williams v. Taylor*, 529 U.S. 362, 412-13, 1120 S. Ct. 1495, 1523 (2000) and *Francis S. v. Stone*, 221 F.3d 100, 108-09 (2d Cir. 2000) (citing *Williams*)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Schriver*, 255 F.3d 45, 52-55 (2d Cir. 2001). Specifically, as the Second Circuit explained in *Sellan v. Kuhlman*, "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." 261 F.3d 303, 312 (2001); *see Jimenez v. Walker*, 458 F.3d 130, 140 (2d Cir. 2006) (citing *Sellan*), *cert. denied sub nom.*, *Jimenez v. Graham*, 127 S. Ct. 976 (2007). Significantly, the Second Circuit further held that when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner

19

prescribed by § 28 U.S.C. 2254(d)(1) to the state court's decision on the federal claim – *even if the state court does not explicitly refer to either the federal claim or to relevant federal case law*."  *Sellan*, 261 F.3d at 312 (emphasis added).[6,7]

When a state court's decision is found to be decided "on the merits," that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts.  *Williams*, 529 U.S. at 405-06, 120 S. Ct. at 1519-20.  Moreover, a federal court engaged in habeas review must also determine not whether the state court's determination was

---

[6]    In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under AEDPA, in which case pre-AEDPA standards would apply.  *Washington*, 255 F.3d at 52-55; *see also Noble*, 246 F.3d at 98.  That court recently clarified in *Sellan*, however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

[7]    In his opinion in *Sellan*, Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard.  *Sellan*, 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so.  *Id.*

merely incorrect or erroneous, but instead whether it was "'objectively unreasonable.'"  *Sellan*, 261 F.3d at 315 (quoting *Williams*, 529 U.S. at 409, 120 S. Ct. at 1521 (O'Connor, J.)).  The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great[.]"  *Francis S.*, 221 F.3d at 111.

If a state court does not adjudicate a petitioner's federal claim "on the merits, " the federal court must instead apply the pre-AEDPA standard of "de novo review to the state court's disposition of the federal claim.  *See Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003)(citing *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)).

     B.    <u>Ground One: The Voluntariness of Petitioner's Statements</u>

Petitioner first claims that his oral statements to law enforcement officials should have been suppressed as products of improper coercion. Specifically, petitioner alleges that 1) the length of the interview during which those statements were made was, in itself, coercive; 2) in obtaining his confession to the claims under investigation the detectives questioning him used trickery; 3) he had very little sleep and a long history of mental illness, both of which conditions were unduly exploited

21

by those questioning him; 4) he was under the influence of cocaine ingested by him while in the police interview room, after finding it hidden in a chair; and 5) investigating officers threatened to arrest his wife if he refused to cooperate.  Dkt. No. 1, Addendum 3, Ground One; Dkt. No. 18 at 3-7.  Respondent counters by arguing that this claim is without merit. Dkt. No. 11, at 17-20.

Petitioner raised this claim in support of his direct appeal.  App. Br. at 26-34, Pro Se Supp. Br. at 18-21.  The Fourth Department rejected the argument, finding that although the suppression hearing testimony confirmed that petitioner suffered from depression and had stayed overnight at a psychiatric clinic on the night before he was interrogated, it also reflected that he appeared to be "fine" at the time of the interrogation and "freely engaged in a conversation with [questioning investigators]."  *McKinney*, 302 A.D.2d at 993, 755 N.Y.S.2d 541. The appellate court further found that petitioner understood his *Miranda* warnings and "knowingly and intelligently waived his rights."  *Id.*  Since the state court considered but rejected this claim on the merits, those findings are entitled to AEDPA deference.

22

1.    Clearly Established Supreme Court Precedent

On habeas review, the determination of whether a statement was

voluntarily presents a legal question that requires independent federal

analysis "based on the totality of the circumstances surrounding the

confession." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir.1997). *See*

*Arizona v. Fulminante*, 499 U.S. 279, 282-89, 111 S. Ct. 1246, 1251-53

(1991); *U.S. v. Tudoran*, 476 F. Supp. 2d 205, 215 (N.D.N.Y.

2007)(Sharpe, J.).  That review includes an examination into whether the

petitioner's waiver of his or her *Miranda* rights was valid. The inquiry into

the circumstances surrounding the confession, including the length and

circumstances of the interrogation and a defendant's prior experience

with the legal system, is "purely factual, and the state court's answer to it

is afforded a presumption of correctness" under 28 U.S.C. § 2254(e)(1).

*Holland v. Donnelly*, 216 F. Supp.2d 227, 231 (S.D.N.Y. 2002), *aff'd* 324

F.3d 99 (2d Cir.), *cert. denied* 540 U.S. 834, 124 S. Ct. 86 (2003).  *See*

*Thompson v. Keohane*, 516 U.S. 99, 111-12, 116 S. Ct. 457, 465 (1995);

*Miller v. Fenton*, 474 U.S. 104, 116-17, 106 S. Ct. 445, 453 (1985);

*Tankleff v. Senkowski*, 135 F.3d 235, 243 (2d Cir.1998); *Dallio v. Spitzer*,

170 F. Supp. 2d 327, 338 (E.D.N.Y. 2001), *aff'd* 343 F.3d 553 (2d. Cir.

2003), *cert*. *denied* 541 U.S. 961, 124 S. Ct. 1713 (2004).

In determining whether a confession was voluntary, courts should consider 1) the characteristics of the accused, including their background and experience, education and level of intelligence; 2) the conditions of interrogation, including the location and length of detection; and 3) the conduct of law enforcement officials, including whether there was physical mistreatment, whether the suspect was deprived of food and water, and whether the suspect was subjected to prolonged restraint in handcuffs or psychologically coercive techniques such as promises of leniency.  *Green v. Scully,* 850 F.2d 894, 901-02 (2d Cir. 1988), *cert*. *denied* 488 U.S. 945, 109 S. Ct. 374 (1988) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S. Ct.  2041, 2047 (1973) and *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S. Ct. 2408, 2416 (1978)); *Tudoran*, 476 F. Supp. 2d at 215.  Among these factors, no one is dispositive.  *Green,* 850 F.2d at 900; *Tudoran*, 476 F. Supp. 2d at 215; *Huntley v. Superintendent*, No. 00-CV-191, 2007 WL 319846, at *11 (N.D.N.Y. Jan. 30, 2007 (Hurd, J).   State courts frequently must resolve conflicts in the testimony of law enforcement officials and defendants when determining whether a statement was voluntary.  In these

24

circumstances, "the law is clear that state-court findings on such matters are conclusive on the habeas court if fairly supported in the record." *Tibbs v. Greiner*, 01-Civ-4319, 2003 WL 1878075 at *9 (S.D.N.Y. 2003). A petitioner bears the burden of overcoming this presumption of correctness by showing, by clear and convincing evidence, that the state court was wrong. *Id.*; *Whitaker v. Meachum*, 123 F.3d 714, 716 (2d Cir.1997).

II.   <u>Contrary to, Or an Unreasonable Application of, Clearly Established Supreme Court Precedent</u>

During its *Huntley* hearing, the trial court heard the testimony of Detectives Edward MacBlane and Steven Stonecypher; Dr. Marilyn S. Ward; Arthur Dougherty, petitioner's parole officer, and the petitioner. Following the hearing the court issued a thirteen page written decision, dated March 30, 2001, denying petitioner's motion to suppress his statement.  Opinion at 1-13. In its decision the trial court made certain factual determinations, finding that 1) petitioner's parole officer, Arthur Dougherty, had required petitioner to receive psychiatric care as a condition of parole (*See* Transcript of Hearing, March 26, 2001 ("Mar. 26 Hrg. Tr.") at 20-22); 2) Dr. Ward diagnosed the petitioner as suffering from a depression disorder and prescribed medications, but was unaware

of whether petitioner was taking them on June 20, 2000 *id*. at 19-20); 3)

Dougherty learned that members of the Syracuse Police Department had

been conducting a burglary investigation, and were attempting to locate

the petitioner (*Id.* at 23-25); 4) on June 19, 2000, at approximately 6:30

p.m., Dougherty found the petitioner outside a grocery store holding a can

of beer (Mar. 26 Hrg. Tr. at 24); 5) petitioner appeared very volatile and

angry, and threatened suicide (*Id*. at 24-26); 6) Dougherty took petitioner

to CPEP, an outreach psychiatric clinic operated at a local hospital (*Id*. at

25-27); 7) Dougherty stayed with petitioner until 2:00 a.m., when he was

admitted into the hospital (*Id.*); 8) Dougherty filed a violation of parole

against petitioner (*Id*. at 27-28); 9) petitioner was released to Dougherty

at approximately 3:00 p.m. on June 20, 2000, after Dr. Frye, a psychiatrist

at CPEP, determined that McKinney was no longer a threat to himself

(Mar. 26 Hrg. Tr. at 28-30, 78-80); 10) Dougherty then transported the

petitioner back to his office, where he called police investigators (*Id*. at

29-30); 11) at that point, petitioner was calm and unemotional (*Id.*); 12) at

approximately 5:00 p.m., Detective MacBlane met with petitioner at the

parole office, and took him to CID (Mar. 23 Hrg. Tr. at 38-40; Mar. 26 Hrg.

Tr. at 30; 13) MacBlane was advised petitioner had been at CPEP, but he

appeared to act normally during the interview (Mar. 23 Hrg. Tr. at 45); 14) MacBlane read petitioner his rights from a *Miranda* rights waiver form and asked after each right whether petitioner understood, to which petitioner responded in the affirmative (*Id*. at 39-43); 15) petitioner read and signed the waiver form at approximately 6:00 p.m., and agreed to speak to police investigators without an attorney present (Mar. 23 Hrg. Tr.  at 38-41); 16) petitioner did not request an attorney, and did not ask to speak to anyone other than police during his interview with MacBlane (*id*. at 52); 17) Detective Stonecypher began interviewing the petitioner at approximately 7:00 p.m., after being advised by MacBlane that petitioner had waived his *Miranda* rights (*id*. at 43, 54-56); 18) Stonecypher knew petitioner from past investigations, and told McKinney he needed to speak to him regarding recent incidents (Mar. 23 Hrg. Tr. at 56; Mar. 26 Hrg. Tr. at 57-58); 19) petitioner talked about himself and his family, and blamed outside influences for his problems (Mar. 23 Hrg. Tr. at 56-60); 20) petitioner admitted involvement in the burglaries under investigation, and began to describe how he committed them (*id*.); 21) at approximately 3:00 a.m. on the following morning, petitioner spoke with his mother (Mar. 23 Hrg. Tr. at 69-71; Mar. 26 Hrg. Tr. at 68-70); (22) when petitioner told

27

Stonecypher he wanted to rest, the interview ceased, and petitioner was taken to be booked on the parole warrant at approximately 8:00 a.m. on June 21, 2000 (Mar. 23 Hrg. Tr. at 70-72; 92-94); and 23) during his interview with Stonecypher, petitioner did not ask for a lawyer (*Id*. at 73). Opinion, at 1-6.

In his decision, Judge Aloi also summarized petitioner's hearing testimony, noting petitioner's testimony to the effect that 1) he was born in 1961; 2) he had his general equivalency diploma ("GED"); 3) he had been arrested in the past, and was familiar with his constitutional rights; 4) police officers threatened to arrest his wife for possession of stolen property if he did not provide a statement; 5) although petitioner's signature appeared in the *Miranda* waiver form, he had no recollection of signing it; 6) he asked for an attorney seven times during the police interview; 7) he was initially denied the use of a bathroom; 8) he denied involvement in the burglaries; 9) he was tired, but questioning detectives would not let him sleep; 10) in an effort to stay awake, petitioner ingested cocaine he discovered hidden inside an interview room chair; 11) he talked with his mother, who advised him not to speak to police officers unless they could assure him of a "deal", and 12) petitioner promised to

cooperate if police would let him sleep.  Opinion, at 6-8; Mar. 26 Hrg. Tr.

at 31-77.  Based upon his assessment, Judge Aloi rejected petitioner's

testimony, finding portions of it to be incredible.  Opinion, at 6-8.

Considering the evidence adduced, the trial court found that 1)

petitioner was "attempting to maintain a facade of innocence by

appearing to cooperate with police" (Opinion, at 6); 2) during the interview

from 5:30 p.m. on June 20, 2000 until 8:00 a.m. on June 21, 2000,

petitioner was "offered drinks, cigarettes and bathroom breaks" and was

not "threatened or tricked into providing police with the various

statements . . . nor did he ask for an attorney during the interview"

(Opinion, at 8-9; Mar. 23 Hrg. Tr. at 73-75, 83-85; Mar. 26 Hrg. Tr. at 61,

65, 72); and 3) that petitioner "did not appear to be intoxicated or under

the influence of drugs and acted in a normal manner during the interviews

and did not ask that the interview be stopped."  (Opinion, at 9; Mar. 23

Hrg. Tr. at 45-52, 74-75, 85, 87-88).  Petitioner has not come forward with

evidence to refute the hearing court's factual findings, which accordingly

are presumed to be correct.  *Whitaker*, 123 F.3d at 716.

In reviewing the entire record, I find no basis to support a finding

that petitioner was unable to make a knowing and intelligent waiver of his

constitutional rights. The totality of the circumstances, including petitioner's age, intelligence, past experience with the criminal justice system, and the circumstances surrounding the interview and the conduct of the police, fully supports the finding that petitioner's statements were voluntary, and made of his own free will. Specifically, petitioner's background and experience do not indicate that he would be susceptible to coercion.  At the time he was interviewed, petitioner was thirty-nine years old, and had his GED.  Mar. 26 Hrg. Tr. at 31-32.  Petitioner had familiarity with the criminal justice system by virtue of his numerous convictions, including two prior convictions for burglary.  *Id.* at 71, Sent. Tr. at 39.  Petitioner and Stonecypher had prior dealings in connection with other investigations.  Mar. 23 Hrg. Tr. at 56; Mar. 26 Hrg. Tr. at 57-58.  Petitioner admitted that he knew and understood his rights.  Mar. 26 Hrg. Tr. at 72.

Upon petitioner's arrival at the police headquarters, Detective MacBlane read him his constitutionally-mandated warnings from a *Miranda* waiver form, one by one, and asked petitioner if he understood each right as it was read to him; in response petitioner indicated he understood each of his rights.  Mar. 23 Hrg. Tr. at 38-42.  Petitioner read

the form and signed it, agreeing to speak with questioning officers. *Id.* at 40-41. McKinney's willingness to speak freely to Detectives MacBlane and Stonecypher regarding his background and upbringing, his past criminal history, his substance abuse problems, and his method of committing the burglaries, as well as his offer to assist law enforcement in preventing burglaries, including his offer to write a book on the subject, all provide indicia that petitioner's statements were purely voluntary. *Id.* at 49-52, 55-63. Additionally, petitioner's past encounters with law enforcement, and, indeed, with Detective Stonecypher, suggest petitioner was aware of his constitutional rights.

During the interview by detectives, petitioner was not handcuffed, was not threatened with physical harm by the detectives, was given bathroom breaks, drinks and cigarettes, and was permitted to speak with his mother. *Id.* at 68-77, 71-74, 84-86; Mar. 26 Hrg. Tr. at 54-56, 60, 65, 68-69, 72. There were frequent breaks during the interrogation, ranging from five to ten minutes in length, during which detectives spoke to each other and evaluated the interview. Mar. 23 Hrg. Tr. at 83-84. Petitioner never asked for a lawyer, or to stop the interrogation until the early morning hours after speaking to his mother, at which time the interview

31

ceased.  *Id.* at 70-72, 92-93.  This evidence suggests that petitioner was not threatened with force, nor was he subjected to coercive measures at any time while in police custody.

Despite the state court's findings and these compelling indicators supporting the finding that petitioner's statement was not coerced, petitioner now claims that the state court's finding that his statement was voluntarily made was contrary to clearly established federal law.  Dkt. No. 1 at Addendum 3; Dkt. No.18, at 2-7.  Petitioner now contends, as he did at the suppression hearing and on appeal, that he suffered from depression, and that when questioning him police officials exploited his mental illness.  While the hearing court acknowledged that petitioner suffered from depression at the relevant times, it concluded that it was only one of many factors to be considered in arriving at its decision. Opinion, at 11.  The Appellate Division affirmed the trial court's finding that petitioner's statements were voluntary, concluding that while the record established that petitioner suffered from depression and had stayed overnight at a psychiatric clinic the night before the interrogation, he seemed "fine" during the interview, did not become upset during questioning by investigating officers, and freely engaged in conversation

with police.  *McKinney*, 302 A.D.2d at 993.

The suppression hearing testimony supports these findings.  Mar. 23 Hrg. Tr. at 23-30, 45-46, 48; Mar. 26 Hrg. Tr. at 78-80.  Both Detective MacBlane and Arthur Dougherty testified, for example, that despite the fact that petitioner spent the night before the interview in a psychiatric hospital, he appeared to be "fine" and cooperative before the interview began.  Mar. 23 Hrg. Tr. at 45-46, 48; Mar. 26 Hrg. Tr. at 29-30. Petitioner was released to Dougherty's custody, despite his threat of suicide, after Dr. David Frye determined that petitioner was no longer a threat to himself.  Mar. 26 Hrg. Tr.  at 28, 78-80.  In light of all the relevant circumstances, petitioner's depressive disorder did not prevent him from making a knowing and intelligent waiver of his rights.  The state court's rejection of this portion of petitioner's claim was therefore neither contrary to nor an unreasonable application of clearly established federal law. *See, e.g. U.S. v. Male Juvenile,* 121 F.3d 34, 40 (2d Cir. 1997)(waiver of rights was knowing and voluntary despite evidence of a mental disability where defendant stated he understood his rights and signed a waiver form prior to confessing).

Petitioner also claims that his interrogation was inherently coercive

because of its fourteen hour duration.  While the length of an

interrogation is undeniably one factor that should be considered when

determining whether a statement was voluntary, no single factor will

control. *Green*, 850 F.2d at 900.  The hearing court concluded that the

length of the interview did not necessarily invalidate McKinney's

statement since he was permitted frequent breaks, and to speak with his

mother.  Opinion at 11-12.  Although the Appellate Division did not

specifically address this portion of petitioner's challenge to his statement,

it noted that "County Court properly denied the motion [of petitioner] to

suppress his statements to police", apparently declining to disturb the

hearing court's findings.  *See McKinney*, 302 A.D.2d at 993, 755

N.Y.S.2d 541.  The suppression hearing testimony established that

petitioner was given drinks and bathroom breaks during the interview,

and spoke with his mother for fifteen to twenty minutes.  Mar. 23 Hrg. Tr.

at 73-79, 69-72.  Petitioner also testified that he was given breaks, along

with cigarettes and coffee, and confirmed that consulted with his mother.

Mar. 26 Hrg. Tr. at 54, 61, 67-70.  The state court's findings that the

length of the interview did not render petitioner's statement invalid was

not contrary to, or an unreasonable application of, clearly established

federal law. *See, e.g., Darwin v. Connecticut*, 391 U.S. 346, 349, 88 S.

Ct. 1488, 1489-90 (1968)(thirty to forty-eight hour interrogation which

included denial of access to an attorney and no breaks rendered

confession involuntary); *U.S. ex rel Daniel v. Wilkins,* 292 F.2d 348, 350

(2d Cir. 1961)(sixteen hours of almost continuous questioning did not

make defendant's statement involuntary where there was no claim of

fatigue, no trickery, humiliation or extreme youth);  *Mackenzie v.

Portuondo*, 208 F. Supp. 2d 302, 324 (E.D.N.Y. 2002) (length of an

interview is but one factor courts consider when determining whether a

statement was involuntary); *U.S. v. Guzman*, 11 F. Supp. 2d 292, 298

(S.D.N.Y. 1998)(while sleep deprivation can be a tool of coercion,

defendant's statement was not coerced even though it was made late at

night where there was no evidence to suggest defendant expressed

fatigue or wanted to end the interview), *aff'd* 152 F.3d 921 (2d Cir. 1998).

Petitioner's final arguments in support of the contention that his

statement was coerced center around his hearing testimony that he used

cocaine in the police interview room, that he demanded a lawyer six or

seven times, to no avail, and that he signed the *Miranda* waiver form only

because police threatened to arrest his wife if he did not cooperate.  Dkt.

35

No. 1, Ground1, Dkt. No. 18, 3-7.  The trial court heard petitioner's testimony on each of these allegations, rejecting them as not being credible.  Judge Aloi specifically found petitioner's claim that he ingested cocaine in the interview room not to be believable.  Opinion at 8.  He further found that petitioner "did not appear to be intoxicated or under the influence of drugs and acted in a normal manner during the interviews . . ."  *Opinion* at 9, 12-13.  It should be noted that despite his claims that he was tired and under the influence of cocaine, McKinney testified that he was clever enough to try to "trick" the police by telling them he had information on the burglaries and would provide it, if only he was allowed to speak to his mother.  Mar. 26 Hrg. Tr. at 63-69.

The hearing court also rejected petitioner's claims that he repeatedly asked for a lawyer and that police threatened to arrest petitioner's wife if he did not cooperate.  It found that petitioner did not ask to speak to a lawyer, and that in fact petitioner was "attempting to maintain a facade of innocence by appearing to cooperate with the police."  *Opinion* at 4- 5; 6, 9, 12; Mar. 23 Hrg. Tr. at 73, 79.  While Detective Stonecypher and Detective MacBlane's testimony that petitioner did not ask for a lawyer (Mar. 23 Hrg. Tr. at 49-52, 73, 79)

36

conflicted with petitioner's testimony that he asked for one six or seven

times, (Mar. 26 Hrg. Tr. at 52-54) the hearing court resolved the conflict in

the testimony against petitioner.  Similarly, the court specifically found

that police did not threaten to arrest petitioner's wife during the course of

the interview, apparently rejecting petitioner's testimony to the contrary.

*Opinion* at 12.  The hearing court's credibility determinations are

supported in the record and, accordingly, are conclusive.  *Tibbs*, 2003

WL 1878075 at *9.  Petitioner has failed to show by clear, convincing

evidence, that these findings of the state trial court were erroneous.

       Based on independent review of the record, I find that the totality of

the circumstances establishes petitioner's statement was made of his

own free will, and was not the product of coercion by law enforcement

officials.  Accordingly, I recommend that petitioner's first ground for

federal habeas relief should be denied.


## C.    Ground Two: Brady Violation

    McKinney next claims that at trial the prosecutor withheld a police

report reflecting that during the course of the burglary investigation, police

investigated an individual named Mark Perry in connection with his

37

knowledge of the travelers checks stolen from 133 Circle Road.  Dkt. No. 1, Addendum 4, at 3; Dkt. No. 18, Traverse, at 8-9, 11).  Petitioner characterizes that report as "potentially exculpatory," arguing that it would have shown that someone else was under investigation for the crimes for which he was being tried.  *Id.* Petitioner also claims that the prosecutor withheld a police report mentioned by its witness, Teddy Johnson, in Johnson's statement to police.  Dkt. No. 1, Addendum 4, at 3; Dkt. 18, Traverse, at 9-10.  McKinney contends that this report was also "potentially exculpatory", and could have been used to compare Johnson's version of events with that given by police officials.  *Id.*

Each of these claims was raised by the petitioner in the *pro se* supplemental brief submitted in support of the direct appeal of his conviction.  *See* Dkt. No. 10, Exh. 3c, Pro Se Supp. Brief, at 16-18. In its decision largely rejecting that appeal, the Appellate Division found that the prosecutor had in fact provided petitioner with "some of the alleged *Brady* material during trial, and defense counsel was given a meaningful opportunity to use that material."  *McKinney*, 302 A.D.2d at 995-96; 755 N.Y.S.2d 541.  The state appellate court further found that petitioner had "failed to establish that the remaining alleged Brady material exists."  *Id.*

Since this claim was presented to the state courts and a decision was rendered, it is deemed exhausted, and the deferential AEDPA standard of review applies.

### 1.   Clearly Established Supreme Court Precedent

A habeas petitioner may be entitled to relief upon a showing that the government violated his or her right to due process by failing to turn over "material exculpatory evidence" before trial. *Giglio v. United States*, 405 U.S. 150, 153-54, 92 S. Ct 763 (1972); *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194 (1963); *Strickler v. Greene*, 527 U.S. 263, 119 S. Ct. 1936 (1999). Under *Brady* and its progeny, prosecutors must disclose information that is favorable to the defense, either because it is exculpatory, relating to the factual innocence of the defendant, or because it serves to impeach a prosecution witnesses. *Strickler*, 527 U.S. at 280, 119 S. Ct. at 1948; *U.S. v. Bagley*, 473 U.S. 667, 676, 105 S. Ct. 3375, 3380 (1985). Evidence that is favorable because of its impeachment value may be material where the witness has supplied the only evidence linking a defendant to the crime at issue, or where the witness has supplied the only support for an essential element of the crime. *U.S. v. Avellino*, 136 F.3d 249, 256-57 (2d Cir. 1998).

A petitioner bears the burden of proving that the prosecution has

withheld material information.  *Harris v. United States*, 9 F. Supp. 2d 246,

275 (S.D.N.Y. 1998).  "Conclusory allegations that the government

'suppressed' or 'concealed' evidence do not entitle [the petitioner] to

relief."  *Id.* (quotations omitted).  *See Strickler,*  527 U.S. at 286, 119 S. Ct.

at 1950-51 ("Mere speculation that some exculpatory material may have

been withheld is unlikely to establish good cause for a discovery request

on collateral review."); *Van Gorden v. Superintendent*, No. 03-CV-1350,

2007 WL 844901, at *8 (N.D.N.Y. Mar. 19, 2007)(Mordue, C.J.)

(unsupported, unspecified *Brady* claim dismissed);  *Mallet v. Miller*, 432 F.

Supp. 2d 366, 378 (S.D.N.Y. 2006)(*Brady* claim dismissed where

supported only by conjecture);  *Skinner v. Duncan*, No. 01-CV-6656, 2003

WL 21386032 at *25 (S.D.N.Y. Jun. 17, 2003)(*Brady* claim failed because

petitioner provided no evidence in support of it); *Ferguson v. Walker*, 00

Civ. 1356, 2002 WL 31246533 at *13 (S.D.N.Y. Oct. 7, 2002)(Petitioner's

"claim of withheld *Brady* material is without evidence and speculative and

must be rejected.").

### 2.   Contrary to, or Unreasonable Application of, Clearly Established Supreme Court Precedent

When analyzed against this backdrop, I find that the record fully

40

supports the Appellate Division's rejection of petitioner's *Brady* claim.  I

first note that McKinney has not presented any evidence, aside from his

bald assertion, that the prosecutor did not disclose reports pertaining to

Mark Perry.  *See Brady*, 373 U.S. at 83, 83 S. Ct. 1194;  *Harris*, 9 F.

Supp. 2d at 275.  In any event, the record refutes this claim.

On June 4, 2001, prior to the commencement of the trial, petitioner

complained that he had not been given Perry's statement.  Trial Tr. at 370-

72.  In response, the prosecutor represented to the court that he had in

fact provided Perry's statement to petitioner, and the court confirmed that

petitioner had received both the statement and a police report regarding

an interview of Perry. Trial Tr. at 373-74.  The court explained to petitioner

that he could use those reports to show that others were under

investigation in connection with the burglaries.  Trial Tr. 372-74.  On cross

examination, McKinney's counsel questioned Detective Dennis Murphy

regarding Perry's status as a suspect.  Detective Murphy explained that

police investigators had learned that Mark Perry had information about the

stolen travelers checks,  and interviewed him in order to document that

information.  Trial Tr. at 445-48.  He went on to state, however, that Perry

was not in possession of the checks, was not a suspect in the burglaries,

and in fact had provided information inculpating the petitioner.  *Id.* at 446-
47, 455. Since the report – which does not appear to exculpate petitioner -
- was disclosed, and counsel had a meaningful opportunity to utilize it
during the course of cross-examining Detective Murphy, petitioner has
failed to establish a *Brady* violation insofar as relates to that document.

Petitioner next claims that he was not provided a police report
referenced by Teddy Johnson in his statement to police.  Specifically,
petitioner alleges that Johnson was interviewed in relation to a burglary
that took place at 222 Moore Avenue in Syracuse, and that Johnson told
police he was in that area to help petitioner steal an air conditioner.  Dkt.
No. 1, Addendum 4, at 3.  Petitioner claims that on the third page of his
statement, Johnson stated "I was told by Det. Buske that the *report*
indicates etc . . .".  *Id.* (emphasis added).  Petitioner claims that the report
referenced by Johnson was not turned over to him, and that it was
potentially exculpatory since he could have used the report "to show the
facts of what happened that night in sombody [sic] else's words than
Teddy Johnson's," and that it supported his position that others were
responsible for the crimes for which he was convicted.  *Id.*

Petitioner requested the report referenced by Johnson before his

trial began.  Trial Tr. at 367.  In response, the prosecutor advised the

petitioner and the court that he had "turned over to [petitioner] every single

report under that DR number [the number that referenced the 222 Moore

Avenue burglary]."  Trial Tr. at 367.

As the Fourth Department intimated, the portion of petitioner's *Brady*

claim regarding the Johnson report is based upon sheer speculation.

Petitioner has failed to attach a copy of Johnson's statement, nor has he

identified what he believes to be the content of the report allegedly

referenced in the statement, and has failed to establish that other

exculpatory reports were withheld, making it all but impossible for this

court to engage in any meaningful review of this portion of his *Brady* claim.

In sum, because it appears from the record that all reports were

disclosed to defense counsel,  and because petitioner had failed to

demonstrate that any other allegedly exculpatory reports were withheld, I

recommend a finding that the  petitioner's *Brady* claim be denied. *Van

Gorden*, 2007 WL 844901 at *8.


D.    Ground Three: Sufficiency of the Evidence

Petitioner next claims that the evidence adduced at trial was

43

insufficient to support his convictions.  Specifically, petitioner claims that the case against him was purely circumstantial, noting that there were no eye-witnesses, no physical evidence, and no fingerprints or DNA evidence linking him to the burglaries.  Dkt. No. 1, Ground 3; Traverse at 12-16. Respondent argues that this claim is without merit.  Dkt. No. 11, at 21-24.

Like his first two claims, this ground was similarly raised by the petitioner on his direct appeal.  Dkt. No. 10, Exh. 3c.  App. Br. at 35-45. Addressing the argument, the Fourth Department ruled that the evidence adduced at trial was legally sufficient to establish that "defendant entered the residences of the victims with the intent to commit a crime therein." *McKinney*, 302 A.D.2d at 994, 755 N.Y.S.2d 541.  Although the Appellate Division's decision appears to address the sufficiency of the evidence only with respect to the burglary convictions, I note that in his direct appeal petitioner challenged the sufficiency of the evidence on all counts, and argued that "[t]here were no independently proved facts that permitted a direct inference of burglary or larceny." App. Br. at 44.  In his habeas petition and Traverse, petitioner now appears also to have challenged the sufficiency of the evidence to sustain all of his convictions.  Dkt. No. 1, Ground Three. Dkt. No. 18, Traverse, at 15.  Since it appears from a

liberal reading of petitioner's direct appellate brief that the challenge to the sufficiency of the evidence on all the charges, including the larceny charges, was fairly presented to the state courts, this claim is deemed exhausted, and the deferential AEDPA standard of review applies. *See Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir. 1997); *Daye v. Attorney Gen. of New York,* 696 F.2d 186, 191 (2d Cir. 1982).

      1.    <u>Clearly Established Supreme Court Precedent</u>

      When engaged in habeas review of an evidence sufficiency claim, a federal court must be particularly respectful of the state courts' determination of the issue.  *Fama v. Comm'r of Corr. Srvcs.,* 235 F.3d 804, 811 (2d Cir. 2000); *Hernandez v. Conway*, 485 F. Supp. 2d 266, 281 (W.D.N.Y. 2007).  A court may grant habeas relief only if it concludes that "the state court's sufficiency ruling 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Policano v. Herbert*, 453 F.3d 79, 91 (2d Cir. 2006) (quoting 28 U.S.C. § 2254(d)(1)). In *Policano*, the Second Circuit specifically held that AEDPA deference applies to sufficiency of evidence claims.  *Policano*, 453 F.3d at 91.  In

fact, the Second Circuit stated that sufficiency review by the federal court is "highly deferential."  *Id.* at 91-92.

Under well-established Supreme Court precedent, the court must view the record in the light most favorable to the government, and determine whether any rational trier of fact would have found the essential elements of the crime, as defined by state law, beyond a reasonable doubt.  *Policano,* 453 F.3d at  92 (citing *In re Winship,* 397 U.S. 358, 364, 90 S. Ct. 1068 (1970).  *See Jackson v. Virginia*, 443 U.S. 307, 318-19, 99 S. Ct. 2781, 2788 (1979)); *Young v. McGinnis*, 411 F. Supp. 2d 278, 312 (E.D.N.Y. 2006).  A federal court may not grant habeas relief simply because of an independent belief that the state court applied federal law "erroneously" or "incorrectly."  *Policano.* 453 F.3d at 92 (citing *Williams,* 529 U.S. at 411, 120 S. Ct. at 1522).  Rather, the habeas court must determine that there is "[s]ome increment of incorrectness beyond error." *Id.* (quoting *Francis,* 221 F.3d at 111).  In reviewing a sufficiency claim under the AEDPA, the habeas court may not simply apply *Winship* independently, but must look to State law to determine the facts necessary to constitute the elements of the crime.  *Id.* (citing *Fama*, 235

46

F.3d at 811).

To sustain petitioner's convictions for second degree burglary under New York law, the state was required to prove that petitioner knowingly entered or remained unlawfully in a dwelling, with the intent to commit a crime therein.  N.Y. PENAL LAW § 140.25(2).  The requisite intent may be inferred from the circumstances, including the actions of the accused, and may be proven by direct or circumstantial evidence. *Stone v. Stinson*, 121 F. Supp. 2d 226, 247 (W.D.N.Y. 2000); *People v. Price*, 35 A.D.3d 1230, 1231, 825 N.Y.S.2d 868, 869 (4th Dept. 2006), *lv. denied* 8 N.Y.3d 926, 866 N.E.2d 462, 834 N.Y.S.2d 516 (2007).  To the extent relevant in this instance, in order to establish petitioner's guilt of fourth degree grand larceny, the state was required to establish that petitioner stole property valued in excess of one thousand dollars, and that the property included a credit card.  N.Y. PENAL LAW §§155.30(1), (4).  Finally, to convict petitioner of petit larceny, the state was required to prove that he stole property, without regard to its value. N.Y. PENAL LAW §155.25.

II.     Contrary to, or an Unreasonable Application of, Clearly
         Established Supreme Court Precedent

The Appellate Division held that there was sufficient evidence to

47

establish petitioner's guilt.   *McKinney,* 302 A.D.2d at 993-94, 755

N.Y.S.2d 541.  Illuminating its reasoning, the appellate court noted that

> [t]he evidence at trial establishes that items were
> taken from the victims' residences during the night
> and that the perpetrator had consumed food or
> beverages while in the residences, as evidenced
> by the food and empty bottles left on the kitchen
> counters there.  Defendant admitted to the police
> that he would consume food while inside a
> residence committing a burglary.  The owner of a
> convenience store testified that he cashed a
> traveler's check for an unidentified man and a man
> whose surname is Johnson.  The traveler's check
> was later identified as one taken from a victim's
> residence, and Johnson testified that he went with
> defendant to the convenience store to cash a
> traveler's check.  Johnson further testified that
> defendant would give items to Johnson to sell, and
> the victims identified some of those items as their
> property.

*Id.*  Those findings are supported by the record evidence at trial.

Petitioner's statements to Johnson and to police officials constituted direct

evidence of his guilt.  Petitioner confided in Johnson that he obtained the

items which he wanted Johnson to sell for him from the University area.

Trial Tr. at 479.  McKinney admitted to police investigators that he

committed burglaries in the University section of Syracuse.  *Id.* at 521-22,

539.  Petitioner also told the officers that he entered homes through open

windows or doors, and that he would prop open outer doors for a swift

exit.  *Id.* at 540-41.  He stated that while inside the homes, he would eat

and drink because he "needed fuel."  *Id.* at 540-41, 552.  Petitioner

described being startled by a cat climbing into one of the open windows at

a residence he had entered.  *Id.* at 552-53.

The evidence at trial amply corroborated these statements.  Four

burglaries took place between April and June 2000 in residential homes in

the University section of Syracuse. The addresses at which those crimes

occurred included 133 Circle Road (DeSalvia residence), 543 Cumberland

Avenue (Curran residence), 856 Maryland Avenue (Grygus residence),

and 1011 Westcott Street (Lentz residence).  Trial Tr. 410-11, 428-32,

457-59, 512-16, 810, 814, 831, 839, 843-44.  In each of those residences,

there was evidence that the intruder had eaten food from the refrigerator

or, at the very least, opened the refrigerator.  Trial Tr. at 411-12 (133

Circle Road - bread and baloney); *Id.* at 433-35 (543 Cumberland Avenue

- beer); *Id.* at 457-58 (856 Maryland Avenue - strawberries and beer); *Id.*

at 512 (1011 Westcott Street - refrigerator cracked open).  In each,

windows and/or doors were open or propped open.  Trial Tr. 411, 431-33,

49

458-59, 511-12.  At the Lentz residence, the family cat was climbing in and out of the open window.  *Id.* at 511.  No one, including petitioner, had permission to enter any of the homes or remove property from them.  *Id.* at 412, 434, 459, 514, 585.

That the petitioner committed larceny while in those dwellings, and had the intent to do so, can be inferred from a number of facts.  Several pieces of property stolen from the homes were recovered and linked to petitioner, including one of the traveler's checks stolen from 133 Circle Road and cashed by petitioner, along with Johnson, at the M & M market (Trial Tr. at 479-82); a blue bag belonging to the Lentz family, containing petitioner's identification, that was recovered from inside Klint's apartment at Presidential Plaza, to which petitioner had a key (Trial Tr. at 642-44); a calculator and computer drive belonging to Grygas, also recovered from Klint's apartment (Trial Tr. at 460, 610-14); and a cell phone belonging to one of the Curran family members, recovered from a resident at Presidential Plaza identified to police by Johnson (Trial Tr. 645-46).  *See* N.Y. PENAL LAW § 155.25.  Property in excess of one thousand dollars was taken from the DeSalvia residence in the form of $900 in traveler's

checks and $800 in cash, one of which was cashed by petitioner.  Trial Tr. at 481-82, 584-85, 822. *See*  N.Y. PENAL LAW §155.30(1).  Several credit cards located inside Eleanor Lentz's briefcase were among the items stolen from the Lentz home, and the bag was recovered from an apartment to which petitioner had a key and, inside the bag, was petitioner's identification. Trial Tr. at 512-515, 642-44, 834. *See* N.Y. PENAL LAW §155.30 (4).

Under the facts and circumstances of this case, it was not irrational for a reasonable factfinder to have found that each element of four counts of second degree burglary, two counts of grand larceny and three counts of petit larceny was proven beyond a reasonable doubt.  *See, e.g.*, *Marmulstein v. Phillips*, No. 05-CV-230, 2007 WL 804111, at *2 (N.D.N.Y Mar. 14, 2007)(Hurd, D.J.)("evidence adduced at trial linking Marmulstein to the burglary included his proximity to the location of the burglary, his statement to a friend the day after the burglary that he had 'hit the jackpot,' his possession of the television and VCR the day after the burglary under suspicious circumstances, his possession of jewelry from the burglary, and his disposition of jewelry taken from the burglary. The

Appellate Division found such evidence sufficient as a matter of law to support Marmulstein's burglary conviction.  That holding is well supported by the evidence and, in any event, was not "'contrary to, or involved an unreasonable application of, clearly established Federal law.'"); *Smith v. Walsh*, No. 02 CIV. 5755, 2003 WL 21649485, at *8 (S.D.N.Y. July 14, 2003)("That the petitioner committed larceny can be inferred from a number of facts. First, shortly after Mr. Smith left the hotel, the security guard testified that he received a complaint from the tourists that their room had been burglarized. When he went to check the room it appeared to be ransacked. Later, police found sums of Czechoslovakian currency in Ms. Smith's purse. The Czech tourists subsequently identified the money as their own. Viewing this evidence in the light most favorable to the prosecution, a rational juror could have found Mr. Smith guilty of burglary beyond a reasonable doubt."); *see also People v. Windbush,* 202 A.D.2d 527, 528, 609 N.Y.S.2d 53 (2d Dept. 1994) ("we conclude that the defendant's guilt was established by evidence that (1) the burglarized house appeared to have been broken into, (2) the defendant stipulated that the fingerprints found inside the house on a kitchen cabinet were his

52

fingerprints, (3) the defendant was not authorized to enter the house, and (4) numerous items of property were missing from the house."), *lv. denied* 83 N.Y.2d 878, 635 N.E.2d 307, 613 N.Y.S.2d 138 (1994). As such, the Appellate Division did not act contrary to or unreasonably apply Supreme Court precedent in rejecting petitioner's evidence sufficiency claim, and I therefore recommend that petitioner's third habeas ground be denied.

     E.   Ground Four: Effectiveness of Trial Counsel

In his fourth claim petitioner argues, based on a myriad of grounds that appear both on and off the record, that his constitutional right to meaningful representation by counsel was abridged.  Based on the face of the record, petitioner claims that his trial counsel failed to 1) obtain fingerprint results from 1011 Westcott Street; 2) obtain reports from a forgery investigation relating to the stolen traveler's checks from 133 Circle Road; 3) obtain reports on a burglary that took place at 222 Moore Avenue; 4) move for severance; 5) properly present *Ventimiglia* issues; 6) keep a transcript of Detective Carr's suppression hearing testimony, instead permitting a read back of his testimony to suffice as preparation

for cross-examination rather than demanding a transcript; 7) object to

hearsay testimony offered by Detective Carr regarding his dealings with

prosecution witness Hans Klint; 8) adequately cross-examine Teddy

Johnson and Detectives Carr and Stonecypher; 9) request a missing

witness charge regarding Klint; 10) request a jury instruction regarding

lesser included charges; 11) object when the prosecutor called petitioner's

wife a liar in summation; and 12) object to the admission of a briefcase

into evidence.  Dkt. No. 1, Ground Four.   Petitioner's additional claims,

based upon matters going beyond the face of the record, include his

contention that 1) counsel was loyal to the court and not to petitioner; 2)

counsel issued an unnecessary subpoena for petitioner's wife; and 3)

counsel failed to investigate the case and prepare a defense. *Id.*

In support of his direct appeal, petitioner raised a general challenge

to the effectiveness of trial counsel in his *pro se* supplemental brief to the

Fourth Department.  Pro Se. Supp. Br. at i.  Specifically, petitioner argued

that trial counsel was ineffective and that "if this issue is sufficiently

reviewed by this court that it could determine that counsel was ineffective

under both state standards; [see People v. Baldi, 54 N.Y.2d 137] and

54

under the federal standard; [see Strictland [sic] v. Washington, 466 U.S. 668]." *Id.* The Appellate Division rejected this general claim, explaining that "[t]he evidence, the law and the circumstances of this case, 'viewed in totality and as of the time of the representation, reveal that the attorney provided meaningful representation'", in accordance with New York standards, including, *inter alia,* as articulated in *People v. Baldi,* 54 N.Y.2d 137, 429 N.E.2d 400, 444 N.Y.S.2d 893 (1981) and *People v. Benevento,* 91 N.Y.2d 708, 697 N.E.2d 584, 674 N.Y.S.2d 629 (1998).[8] *McKinney,* 302 A.D.2d at 995, 755 N.Y.S.2d 541.  That determination is entitled AEDPA deference.

---

[8]      The interplay between the well-accepted standard for judging an attorney's performance under the Sixth Amendment and the prevailing test under New York law, particularly with respect to the prejudice prong of the controlling analysis, is an issue which has received increasing attention, with recent federal decisions reflecting some degree of tension between the two points of view. See, *e.g.*, *Henry v. Poole*, 409 F.3d 48 (2d Cir. 2005), *cert. denied*, 546 U.S. 1040, 126 S. Ct. 1622 (2006).  Prior to rendering its decision in *Henry*, the Second Circuit had previously held that the "meaningful representation" test applied by the New York courts is not "contrary to" the governing federal standards, for purposes of the AEDPA, even though the prejudice prong of its analysis is significantly less reaching than under its federal counterpart. *See*, *e.g.*, *Lindstadt v. Keane*, 239 F.3d 191, 198 (2d Cir. 2001) (citing *Loliscio v. Goord*, 263 F.3d 178, 192-93 (2d Cir. 2001) and *Eze v. Senkowski*, *321* F.3d 110, 122-24 (2d Cir. 2003)).  Whether that viewpoint will stand the test of time, particularly in light of the Supreme Court's decision in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495 (2000), is subject to some doubt.  *See Henry*, 409 F.3d at 68-72.

1.   Exhaustion

Some of the specific grounds now raised in McKinney's habeas petition, however, were never raised in the state courts.  As a threshold matter, I must therefore determine the legal consequences, if any, associated with this failure to first present the arguments now being made to the state courts before raising them as a basis for federal habeas intervention.

Prior to seeking federal habeas relief, a petitioner must exhaust available state remedies, or establish either an absence of available state remedies or that such remedies cannot adequately protect his or her rights. *Aparicio*, 269 F.3d at 89 (quoting 28 U.S.C. § 2254(b)(1)); *Ellman v. Davis*, 42 F.3d 144, 147 (2d Cir. 1994), *cert. denied* 515 U.S. 1118, 115 S. Ct. 2269 (1985). The exhaustion doctrine recognizes "respect for our dual judicial system and concern for harmonious relations between the two adjudicatory institutions." *Daye,* 696 F.2d at 191.  "Comity concerns lie at the core of the exhaustion requirement."  *Galdamez v. Keane*, 394 F.3d 68, 72 (2d Cir. 2005), *cert. denied by Galdamez v. Fischer*, 544 U.S. 1025, 125 S. Ct. 1996 (2005).  Though both federal and state courts are

56

charged with securing a state criminal defendant's federal rights, the state courts must initially be given the opportunity to consider and correct any violations of federal law.  *Id.* "The chief purposes of the exhaustion doctrine would be frustrated if the federal habeas court were to rule on a claim whose fundamental legal basis was substantially different from that asserted in state court." *Daye*, 696 F.2d at 192 (footnote omitted).

This exhaustion requirement is satisfied if the federal claim has been "fairly presented" to the state courts.  *See Dorsey,* 112 F.3d at 52 (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509 (1971)).  A claim has been "fairly presented" if the state courts are apprised of "both the factual and the legal premises of the claim [the petitioner] asserts in federal court." *Daye*, 696 F.2d at 191.  Thus, "the nature or presentation of the claim must have been likely to alert the court to the claim's federal nature." *Id.* at 192.

When a claim has never been presented to a state court, a federal court may find that there is an absence of available state corrective process under § 2254(b) "if it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state

forum would be futile." *Aparicio*, 269 F.3d at 90 (citing *Reyes v. Keane*,

118 F.3d 136, 139 (2d Cir. 1997)); *Lurie v. Wittner*, 228 F.3d 113, 124 (2d

Cir. 2000)(federal court may address merits of a habeas petition

containing unexhausted claims where there is no further state proceeding

for petitioner to pursue or where further pursuit would be futile), *cert*.

*denied* 532 U.S. 943, 121 S. Ct. 1404 (2001).

As petitioner concedes, twelve of his challenges to the effectiveness

of trial counsel, including the failure to object to the admission of evidence

and the failure to request certain jury instructions, are based upon facts

that appear on the face of the record and, accordingly, could have been

raised on direct appeal. *See* Dkt. No. 1, Ground 4 at p.4.   Petitioner

cannot now raise these claims in a second direct appeal, since in New

York a defendant is "entitled to one (and only one) appeal to the Appellate

Division." *Aparicio*, 269 F.3d at 91.  Moreover, since "New York does not

otherwise permit collateral attacks on a conviction when the defendant

unjustifiably failed to raise the issue on direct appeal," *id.* (citing CPL

440.10(2)(c)), petitioner cannot now properly raise these claims, which are

based on the record, by way of a section 440 motion. *Aparicio*, 269 F.3d

at 91; *Bossett,* 41 F.3d at 829.  *See Hogan v. West*, 448 F. Supp. 2d 496, 507 (W.D.N.Y. 2006)("Because there is no reason to believe that the trial record was in any way insufficient to allow the Appellate Division to hear an ineffective assistance of counsel claim based on the failure to object to the prosecutor's summation, any attempt by [petitioner] to seek state court review pursuant to C.P.L. § 440.10 would be futile.").  These claims are therefore "deemed exhausted" for purposes of petitioner's habeas petition. *Aparicio*, 269 F.3d at 90; *Spence v. Superintendent, Great Meadow Corr. Fac.,* 219 F.3d 162, 170 (2d Cir. 2000); Senor v. Greiner, No. 00-CV-5673, 2002 WL 31102612, at *10 (E.D.N.Y. Sept. 18, 2002).

### 2.    Procedural default

The ineffective assistance arguments now deemed exhausted are also procedurally defaulted.  *Aparicio*, 269 F.3d at 90.  Accordingly, a federal court may not engage in habeas review of the claim unless the petitioner demonstrates either 1) both good cause for and actual prejudice resulting from his procedural default, or 2) that the denial of habeas relief would leave unremedied a fundamental miscarriage of justice.  *Fama,* 235 F.3d at 809; *Garcia v. Lewis*, 188 F.3d 71, 76-77 (2d Cir. 1999); *Levine v.*

59

*Comm'r of Corr. Servs.*, 44 F.3d 121, 136 (2d Cir. 1995).  Under this second exception, which is both exacting and intended for the "extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent[,]" *Murray v. Carrier*, 477 U.S. 478, 496, 106 S. Ct. 2639, 2649 (1986), "the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Id.* at 495, 106 S. Ct. at 2649 (quoting *Engle v. Isaac*, 456 U.S. 107, 135, 102 S. Ct. 1558, 1576 (1982)).

To establish "cause" sufficient to excuse a procedural default, a petitioner must show that some objective external factor impeded his or her ability to comply with the relevant procedural rule.  *Coleman v. Thompson*, 501 U.S. 722, 753, 111 S. Ct. 2546, 2566 (1991) (citing *Murray*, 477 U.S. at 488); *Resprepo v. Kelly*, 178 F.3d 634, 639 (2d Cir. 1999).  Examples of such external mitigating circumstances can include "interference by officials," ineffective assistance of counsel, or that "the factual or legal basis for a claim was not reasonably available" at trial or

on direct appeal.[9]  *Murray*, 477 U.S. at 488, 106 S.Ct. at 2645.  When a

petitioner has failed to establish adequate cause for his or her procedural

default, the court need not go on to also examine the issue of prejudice,

since federal habeas relief is generally unavailable as to procedurally

defaulted claims unless both cause and prejudice are demonstrated.

*Stepney v. Lopes*, 760 F.2d 40, 45 (2d Cir. 1985); *Long v. Lord*, No. 03-

CV-0461, 2006 WL 1977435, at *6 (N.D.N.Y. Mar. 21, 2006)(McCurn,

S.J.); *Staley v. Griener*, No. 01 Civ. 6165, 2003 WL 470568, at *7

(S.D.N.Y. Feb. 6, 2003).  In such a case, absent evidence to show the

petitioner's innocence of the crime of conviction, no basis is presented to

conclude that the failure to consider the merits of the federal claim would

result in a fundamental miscarriage of justice, which has been interpreted

as amounting to "an unjust incarceration."  *Spence*, 219 F.3d at 170.

    Here, petitioner contends that cause is established, arguing that his

appellate counsel was ineffective for not challenging trial counsel's

---

        [9]     It should be noted, however, that "[a]ttorney ignorance or
inadvertence is not 'cause' because the attorney is the petitioner's agent when
acting, or failing to act, in furtherance of the litigation, and the petitioner must 'bear
the risk of attorney error.'" *Coleman*, 501 U.S. at 753, 111 S.Ct. at 2566-67 (quoting
*Murray,* 477 U.S. at 488, 106 S.Ct. at 2645).

ineffectiveness on direct appeal.  Dkt. No. 1, at Ground 5.  The

ineffectiveness of counsel for not raising or preserving a claim in state

court will be sufficient to show cause for a procedural default only when

counsel was so ineffective that the representation violated the petitioner's

Sixth Amendment right to counsel.  *Edwards v. Carpenter*, 529 U.S. 446,

451, 120 S. Ct. 1587, 1591 (2000); *Aparicio,* 269 F.3d at 91. Petitioner's

claim that appellate counsel was ineffective, however, is unexhausted

since he did not raise it in a state *coram nobis* petition and in any event it

is without merit.[10]  *Id*.  Because petitioner's claim that appellate counsel

was ineffective is meritless, it may not serve as "cause" for a procedural

default.  *Aparicio*, 269 F.3d at 91-92.  Although petitioner contends that he

is innocent, he has not presented any new evidence that he is "actually

innocent" of the crimes for which he was convicted.  *See Schulp v. Delo*,

513 U.S. 298, 327 (1995).  Since petitioner has not established cause,

the court need not address whether petitioner suffered prejudice, and

federal review of this claim is barred. *See Calderon* v. Thompson, 523

U.S. 538, 559, 118 S. CT. 1489, 1502; *Coleman*, 501 U.S. at 753;

---

[10]     This issue is more fully discussed further on in this report.  *See* pp.
64-87, *post.*

*Stepney,* 760 F.2d at 45; *Long,* 2006 WL 1977435, at \*6.  Even if this claim was not procedurally barred, petitioner is entitled to no relief because, as discussed below, the claim is without merit.

Three of petitioner's additional claims, in which he asserts that trial counsel was loyal to the court and not to him, that counsel issued an unnecessary subpoena to petitioner's wife, and that counsel failed to investigate the case and prepare a defense, were also not presented to the state courts.  *See* Dkt. No. App. Br. at 8).  The basis for these claims is not apparent on the face of the record and, accordingly, petitioner could still raise them in a CPL § 440.10 motion.  These claims are therefore unexhausted. *Reyes,* 118 F.3d at 139 (citing *People v. Harris*, 109 A.D.2d 351,360-61, 491 N.Y.S.2d 678, 687 (2d Dept.1985) (holding that trial record was insufficient to require that an ineffective assistance of counsel claim relating to alleged faulty legal advice be brought on direct appeal), *lv. denied*, 66 N.Y.2d 919, 489 N.E.2d 779, 498 N.Y.S.2d 1034 (1985)).

A federal court may, in its discretion, review unexhausted claims and deny them on the merits if they are "plainly meritless" (*Rhines v. Weber*, 544 U.S. 269, 277, 125 S. Ct. 1528, 1535 (2005)) or "patently frivolous."

*McFadden v. Senkowski*, 421 F. Supp. 2d 619, 621 (W.D.N.Y. 2006);

*Wheeler v. Phillips*, No 05-CV-4399, 2006 WL 2357973, at *5 (E.D.N.Y.

Aug. 15, 2006).   Since petitioner's unexhausted claims are indeed plainly

meritless, I have chosen to address them.  28 U.S.C. § 2254 (b)(2).

### 3.   The Merits

_____Under the well-established standard governing such claims, in order

to prevail on an ineffective assistance of counsel claim a petitioner must

show both that 1) his or her counsel's performance was deficient, in that it

failed to conform to an objective, reasonableness threshold minimum

level, and 2) that deficiency caused actual prejudice to the defense, in that

the petitioner was effectively deprived of a fair trial, the results of which

were reliable. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct.

2052,2064 (1984); *Murden v. Artuz*, 497 F.3d 178, 198 (2d Cir. 2007)*;*

*Greiner v. Wells,* 417 F.3d 305, 319 (2d Cir. 2005), *cert. denied,* 546 U.S.

1184, 126 S. Ct. 1363 (2006). To be constitutionally deficient, the

attorney's conduct must fall "outside the wide range of professionally

competent assistance." *Strickland,* 466 U.S. at 690, 104 S. Ct. at 2066;

*Greiner*, 417 F.3d at 319 (citing *Strickland).*  An attorney's performance is

judged against this standard in light of the totality of the circumstances and from the perspective of counsel at the time of trial, with every effort being made to "eliminate the distorting effects of hindsight[.]" *Strickland*, 466 U.S. at 689,104 S. Ct. at 2065; *Greiner,* 417 F.3d at 619 (citing Strickland).

When reviewing an attorney's performance against this backdrop, a court will generally indulge in a presumption that constitutionally adequate assistance has been rendered, and significant decisions have been made through the exercise of sound professional judgment to which "a heavy measure of deference" is afforded. *Strickland,* 466 U.S. at 691, 104 S. Ct. at 2066; *Greiner,* 417 F.3d at 319 (citing *Strickland).*  In a case such as this, a petitioner must establish that his or her attorney omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker; it is not enough to show only that counsel omitted a nonfrivolous argument, as an attorney has no duty to advance every such argument. *Jones v. Barnes,* 463 U.S. 745,754, 103 S. Ct. 3308, 3314

*(1983); Mayo v. Henderson,* 13 F.3d 528, 533 (2d Cir.) (citing *Jones), cert. denied,* 513 U.S. 820, 115 S. Ct. 81 (1994).

Addressing the second prong of the *Strickland* test, courts have generally held that prejudice is established by showing that there is a "reasonable probability" that but for the deficiency "the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694, 104 S. Ct. at 2068; *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005); *Reed v. Smith,* No. 05-CV-3969, 2006 WL 929376, at *6 (E.D.N.Y. Apr. 11, 2006). Any counsel errors must be considered in the aggregate, rather than in isolation. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001). The failure to make meritless arguments or objections cannot constitute ineffective assistance. *United States v. Arena*, 180 F.3d 380, 396 (2d Cir. 1999), *cert. denied,* 531 U.S. 811, 121 S. Ct. 33 (2000).

3. Contrary To Or Unreasonable Application of Clearly Established Supreme Court Precedent

Analyzed under these controlling standards, petitioner's claims fail; a review of the record fails to reveal any constitutionally significant

66

shortcoming on the part of petitioner's counsel in properly representing

him.  At trial, counsel's apparent theory of the case was that he was home

with his wife and niece at the relevant times, and that accordingly, he

could not have committed the burglaries, and further that the evidence

showed, at worst, that petitioner possessed stolen property - a crime for

which he was not charged.  Trial Tr. at 726-68.  Counsel also claimed that

others, including Mark Perry and Teddy Johnson, actually committed the

crimes for which McKinney was accused.  *Id.*  Counsel pointed out that

there were no witnesses to the actual burglaries, that there was no

fingerprint evidence linking McKinney to the crime scenes, that the

prosecution's case was circumstantial, and that petitioner's statement was

not a confession, but instead little more that "grandiose, boastful talk."  *Id.*

at 763.  The court is unable to conclude that these strategies were not the

product of sound professional judgment, but instead indicative of

constitutionally deficient representation.

The record also reveals that at the appropriate junctures,

McKinney's trial counsel filed appropriate motions, and vigorously cross-examined witnesses. *See* Pro Se Supp. Br. Exh. A; Trial Tr. at 414-18, 424-27, 434-35, 446-55, 462-64, 470-76, 485-92, 494-96, 504-509, 516, 555-68, 575-81, 586-91, 600, 619-36, 652-60.  Petitioner's attorney objected repeatedly to the admission of any evidence of uncharged prior burglaries or other crimes (Trial Tr. at 521-27, 528-30), and moved for a mistrial on the ground that too much evidence had been permitted as to uncharged crimes, resulting in an unfair trial.  Trial Tr. at 668-70.  Counsel moved to suppress petitioner's statement (Hearing Tr. 1, 2), and challenged the validity of Elizabeth McKinney's consent to a search of the couple's apartment. Consent to Search Hearing, June 1, 2001, at 1-39. Counsel also presented a meaningful an alibi defense, Trial Tr. at 670-708, and moved for a trial order of dismissal at the close of the People's case, making specific arguments as to each crime charged, and later renewed that motion at the close of petitioner's case.  Trial Tr. at 666-68, 709-10.  Indeed, counsel's strategy proved partially successful when

petitioner was acquitted of three counts of the indictment, including one count of second degree burglary.  Trial Tr. 876-78.

One aspect of McKinney's ineffective assistance claim surrounds his counsel's alleged failure to obtain fingerprint reports for the 1011 Westcott Street burglary.  This claim is fatally undermined by the record, which shows that on June 6, 2001, the prosecutor did in fact receive a fingerprint report for 1011 Westcott Street from Officer William Donahue, and immediately provided it to McKinney's counsel.  Trial Tr. at 591.  The report, used by trial counsel on cross-examination, revealed that Donahue compared fingerprints lifted from the point of entry at 1011 Westcott Street to petitioner's fingerprints, and determined that the two did not match.  *Id.* at 603-04, 607.  Since petitioner's trial counsel received the report when it became available, and successfully used it on cross-examination, this claim of ineffectiveness should therefore be denied.

Petitioner further claims that his trial counsel should have obtained police reports from a forgery investigation relating to the traveler's checks

stolen from 133 Circle Road, but failed to do so.  At trial, petitioner argued

that he had not received these reports, and additionally asked for

statements of Veronica and Mark Perry and Teddy Johnson.  Trial Tr. at

370-71.  The prosecutor turned over to defense counsel Mark Perry's

statement and the reports relating to the police interview of Mark Perry,

and explained that Veronica Perry did not give a written statement.  Trial

Tr at 370-71, 374-75.  Trial counsel used that information to cross-

examine Detective Dennis Murphy regarding the nature of the forgery

investigation involving Veronica and Mark Perry's knowledge of the stolen

checks, and whether they were suspects in the burglary investigation.

Trial Tr. at 446-55.  Since the reports were obtained and effectively used

at trial, this allegation that trial counsel was ineffective should also be

denied.

Petitioner also contends that his trial counsel was ineffective for not

obtaining reports for a burglary at 222 Moore Avenue.  This claim similarly

should also be dismissed, since the record shows that petitioner was not

charged with this burglary, and in any event every police report pertaining to that burglary was turned over to trial counsel.  Trial Tr. at 366-68.

Petitioner additionally argues that his trial counsel should have sought a severance of the five separate burglary charges, for purposes of trial, but failed to do so.  This claim is refuted by the record.  Petitioner attached a copy of trial counsel's Affidavit in Support of Pretrial Motions to his Pro Se Supplemental Brief on direct appeal.  Dkt. No. 10, Exh. 3c, Pro Se Supp. Br. at Exh. A.  In paragraphs five through nine, trial counsel specifically moved for such a severance.  *Id.*  This claim should also be dismissed.

Petitioner next asserts that trial counsel was ineffective with regard to the presentation of *Ventimiglia* issues.  Under New York law, the People must seek a ruling from the trial court before introducing evidence of uncharged crimes at trial.  *People v. Ventimiglia*, 52 N.Y.2d 350, 420 N.E.2d 59, 438 N.Y.S.2d 261 (1981).  When evidence of uncharged crimes is part of the history of the charged crimes, it is admissible. *Pena v.*

71

*Fischer*, No. 00 civ 5984, 2003 WL 1990331, at *10 (S.D.N.Y. Apr. 20, 2003).

In this instance McKinney's trial counsel did in fact object to the admission of any testimony regarding uncharged crimes.  Specifically, counsel objected to the introduction of 1) any testimony that petitioner had been in state prison; 2) Johnson's anticipated testimony that petitioner was with him to commit a burglary that was not completed; 3) Detective Carr's anticipated testimony that petitioner admitted to between twenty-five and fifty burglaries; and 4) Detective Stonecypher's anticipated testimony regarding prior burglaries petitioner discussed in his statements. Trial Tr. at 8-10, 12, 16-19.  The prosecutor argued that petitioner's references in his statement to uncharged burglaries were inextricably interwoven with his confession to the five burglaries for which he was charged.  *Id.* at 13-14.  In response to petitioner's arguments, the trial court stated that it would admonish the jury to consider evidence only as it related to the crimes for which petitioner was charged, and in fact fulfilled

72

that promise during the trial.  Trial Tr. at 14, 442-43, 482-83, 551.  The

court also ruled that the prosecutor should be limited to proving only

admissions by the petitioner that pertained to the charged crimes.  *Id.* at

18-24.  During Detective Stonecypher's testimony, trial counsel objected

to a general reference to burglaries, and the court again instructed the

prosecutor to narrow Stonecypher's testimony regarding petitioner's

admissions to having committed prior burglaries to those that were

inextricably interwoven.  Trial Tr. at 523-31.  Counsel then engaged in a

lengthy cross-examination and established that petitioner never identified

to police the houses he burglarized, and never specified the food

consumed by him at the houses or the property taken from them.  Trial Tr.

at 559-61, 562-63, 565-68.  On the record before me, I cannot say that

counsel ineffectively handled the *Ventimiglia* issues in this case.

Petitioner further claims his trial counsel failed to demand that

Detective Carr's suppression hearing testimony be formally transcribed,

instead relying upon a read-back of that testimony in preparation for

cross-examination.  Counsel did in fact request a transcript of the relevant

trial excerpts, and noted petitioner's objection to permitting Carr to testify

without it; unfortunately, however, the court stenographer had not yet

completed the transcript by the time it was needed.  Trial Tr. at 588.  The

trial court offered to have the stenographer read Carr's testimony to

counsel and petitioner, and counsel agreed.  Trial Tr. at 589, 609.

Counsel cross-examined Carr extensively.  Trial Tr. at 619-36.  Petitioner

does not now explain how having a formal transcript of Carr's suppression

hearing testimony would have changed the outcome of the trial.  This

claim should also be dismissed.

Petitioner's next contention, to the effect that trial counsel was

ineffective for not objecting to hearsay testimony offered by Detective Carr

regarding his conversations with Hans Klint, is equally unavailing.  The

record reveals that trial counsel objected twice to Carr's testimony

regarding Klint on hearsay grounds.  On the first occasion, the objection

was overruled.  Trial Tr. at 611.  The second objection, however, was

sustained, and the trial court issued a cautionary instruction directing the jury to disregard Carr's testimony that Klint told Carr petitioner delivered stolen property to Klint's apartment. *Id.* at 612-13. Trial counsel then extensively cross-examined Carr regarding his dealings with Klint and the location of the stolen property in his apartment. Trial Tr. at 628-30, 633-36. Since counsel did exactly what petitioner claimed he failed to do, this portion of his claim is similarly deficient.

Petitioner also claims that his trial counsel did not adequately cross-examine Teddy Johnson and Detectives Stonecypher and Carr. Petitioner does not explain what was deficient about counsel's questioning, however, nor has he established any prejudice resulting directly from this alleged shortcoming. In any event, the record discloses that counsel vigorously cross-examined these witnesses. Trial Tr. at 485-92, 494-96, 555-68, 575-81, 619-36. This claim should therefore be dismissed.

Petitioner also alleges that his trial counsel's performance was ineffective because he did not timely request a missing witness charge for

Hans Klint.[11]  While McKinney's counsel did ultimately request such a

charge, he did so after both the prosecutor and petitioner had rested.

Trial Tr. at 711-12.  The Appellate Division found that the request for this

instruction was therefore untimely.  *McKinney*, 302 A.D.2d at 995, 755

N.Y.2d at 541.  Notably, the trial court explained to petitioner that it was

denying his request for a missing witness instruction not because it was

untimely, but because the court did not feel that the charge was warranted

based upon the facts of the case and the witnesses.  Trial Tr. at 713-14.

Whether a missing witness charge should be given lies in the sound

discretion of the trial court. *Moore v. West*, No. 03 CV 0053, 2007 WL

1302426, at *16 (N.D.N.Y. May 1, 2007)(Scullin, S.J)  Thus, even if

counsel's request for such an instruction had been timely, it appears

unlikely that it would have been granted.

---

[11]      "A missing witness charge allows the jury to draw an adverse
inference that the testimony of uncalled witnesses would have been unfavorable to
the party that declined to call them." *Glover v. Bennett*, No. 98-CV-0607, 2001 WL
1862807, at *5 (N.D.N.Y. Feb. 26, 2001) (Sharpe, M.J.) (citation omitted), adopted,
*Glover v. Bennett*, No. 98-CV-0607 (Dkt. No. 23) (N.D.N.Y. Sept. 27, 2001)
(Mordue, J.), *aff'd without op.*, *Glover v. Bennett*, No. 01-2633 (No. 98-CV-0607,
Dkt. No. 30) (2d Cir. Mar. 4, 2003), *cert. denied*, *Glover v. Bennett*, 539 U.S. 907,
123 S.Ct. 2258 (2003).

In any event, this element of petitioner's ineffectiveness claim also fails because in light of his inability to establish resulting prejudice. To be entitled to a missing witness charge under New York law, petitioner would have had to show that 1) Klint was knowledgeable about an issue material to the trial; 2) that he was expected to give noncumulative testimony favorable to the prosecution, and 3) that Klint was available to the prosecution. *Farr v. Greiner*, No. 01 CR 6921, 2007 WL 1094160, at *13 (E.D.N.Y. Apr. 10, 2007); *People v. Macana*, 84 N.Y.2d 173, 196, 615 N.Y.S.2d 656 (1994), *lv. denied*, 82 N.Y.2d 756, 624 N.E.2d 184, 603 N.Y.S.2d 998 (1993); *People v. Gonzalez*, 68 N.Y.2d 424, 427, 502 N.E.2d 583, 509 N.Y.S.2d 796 (1986). Petitioner has not set forth any evidence to show that Klint would have provided favorable testimony for the prosecution.  In fact, his argument is exactly the opposite - that Klint would testify that it was Teddy Johnson, and not the petitioner, who brought the stolen property to Klint's apartment.  Trial Tr. at 723-24.  *See Moore*, 2007 WL 1302426 at *18 (petitioner's claim that he was improperly

denied a missing witness charge did not provide grounds for habeas relief where petitioner failed to show, among other things, that the witness would have testified favorably for the prosecution).

Similarly, petitioner has failed to establish that he would have obtained a greater benefit had the court instructed the jury on the adverse inference permitted under the missing witness charge.  Counsel noted in his summation that Klint had not testified, pointing out that according to the testimony of police officers most of the recovered stolen property including, "[e]verything but the metal box and the traveler's checks", came out of Klint's apartment.  Trial Tr. at 744.  Counsel told the jury, "[h]e [Klint] didn't come in and tell you anything about how it [the property] got there.  How long it had been there. Just, he didn't do it. . .  That is testimony you do not have in this case." *Id.*  Since defense counsel was permitted to emphasize Klint's absence in his summation, "there is no reasonable probability that, but for the untimeliness of counsel's request, the result of the proceeding would have been different."  *Cruz v. Conway*, No. 05 CV

4750, 2007 WL 1651855, at *6 (E.D.N.Y. Jun. 6, 2007) (no prejudice as a result of counsel's untimely request for a missing witness charge where counsel argued the point to the jury).  *See Farr v. Greiber*, No. 01 Civ. 6921, 2007 WL 1094160, at *14 (E.D.N.Y. Apr. 10, 2007) ( "Since defense counsel was permitted to emphasize those witness's absence in summation, there is no prejudice to petitioner." (rejecting habeas claim that trial court erred in denying missing witness charge)); *Ramos v. Phillips*, No. 05 Civ. 0023, 2005 WL 1541046, at *9 (E.D.N.Y. 2005) (rejecting ineffective assistance claim because "it cannot be said that defendant would have obtained a greater benefit had the jury been permitted to consider the adverse inference contained in the missing witness charge" where defense counsel highlighted absence of witness in summation).  I therefore recommend the denial of this aspect of the petition.

Petitioner next claims that his trial counsel was ineffective for not requesting a jury instruction regarding what he considers to be the "lesser

included offense" of possession of stolen property, despite counsel's

argument to the jury that the evidence showed, at worst, that McKinney

was guilty of that charge.  Dkt. No. 1, Ground Four.   Under New York law,

a trial court "may submit in the alternative any lesser included offense if

there is a reasonable view of the evidence which would support a finding

that the defendant committed such lesser offense but did not commit the

greater ...." N.Y. CRIM. PROC. LAW § 300.50(1).  Based upon the

evidence at trial regarding the value of the stolen property, only criminal

possession of stolen property in the fourth and fifth degrees would

arguably have been applicable in this case.  N.Y. PENAL LAW §§165.45

(1), (2); 165.40.  As petitioner's counsel likely appreciated, however, those

charges are not properly considered as lesser included offenses of fourth

degree grand larceny or second degree burglary.  *See*, *e.g. People v.

Kohl*, 19 A.D.3d 1155, 1156, 798 N.Y.S.2d 276, 277 (4th Dept.

2005)(fourth degree criminal possession of stolen property is not a lesser

included offense of fourth degree grand larceny or second degree

burglary); *People v. Perez*, 156 A.D.2d 7, 12, 553 N.Y.S.2d 659, 662 (1st

Dept. 1990)(fifth degree possession of stolen property is not a lesser

included offense of second degree burglary), *lv. denied* 76 N.Y.2d 794,

559 N.E.2d 693, 559 N.Y.S.2d 999 (1990).  Thus, if counsel's theory that

petitioner was guilty of no more than possession of stolen property had

been accepted by the jury, petitioner would have been acquitted of his

crimes actually charged.  In this instance, counsel cannot be deemed

ineffective for failing to make a meritless request for an inapplicable jury

instruction.

　　　I note further that having independently canvassed the applicable

sections of the New York Penal Law, I find that no reasonable view of the

evidence supports a finding that petitioner committed any other lesser

included offenses.  For example, a jury could not reasonably view the

evidence and find that petitioner was guilty of criminal trespass in the

second degree, which is recognized as a lesser included offense of

second degree burglary, because the evidence established that petitioner

entered the homes with the intent to remove property from them and not to

simply enter or remain without permission in the homes.  *See People v.*

*Peyton*, 244 A.D.2d 976, 665 N.Y.S.2d 218 (4th Dept. 1997)(second

degree criminal trespass is a lesser included offense of second degree

burglary), *lv. denied* 91 N.Y.2d 896, 691 N.E.2d 1036, 669 N.Y.S.2d 10

(1998); *People v. Hoyle*, 211 A.D.2d 973, 621 N.Y.S.2d 756 (3d Dept.

1995)(no error to decline to charge second degree criminal trespass as a

lesser included offense of first degree burglary where no reasonable view

of the evidence supported defendant's claim that he committed the lesser

and not the greater), *lv. denied* 86 N.Y.2d 736, 655 N.E.2d 714, 631

N.Y.S.2d 617 (1995).  Similarly, a jury could not reasonably view the

evidence and find that petitioner was guilty of petit larceny, a lesser

included offense of fourth degree grand larceny, because the value of the

items taken from Donald DeSalvia exceeded $1,000, and petitioner stole

credit cards from Eleanor Lentz. *See* N.Y. PENAL LAW §§155.30(1), (4).

Since any request to charge lesser included offenses in all likelihood

would have been denied, petitioner was not prejudiced by trial counsel's failure to make such a request.

To the extent that petitioner claims counsel was ineffective because he would not "champion" petitioner's objection to the trial court's circumstantial evidence charge, that claim should also be dismissed.  It should initially be noted that petitioner does not point to a specific deficiency in connection with the court's circumstantial evidence charge. In any event, the record is clear that counsel indeed made an exception to the charge.  Trial Tr. at 860.  The court noted the objection, but found that the instruction had been clear.  *Id.*  Since his trial counsel lodged an objection regarding the disputed instruction, petitioner's claim is without merit.

Petitioner next claims that his trial counsel should have objected to portion of the prosecutor's closing in which he called petitioner's wife a liar.  Although the prosecutor asserted that in her testimony petitioner's wife was not being truthful, and pointed out that she testified she would do

anything for petitioner, the prosecutor did not call petitioner's wife a liar.

Trial Tr. at 783.  Those remarks were in fair response to trial counsel's

closing argument, to the effect that the jury should believe petitioner's wife

over Johnson, implying that Johnson was incredible.  Trial Tr. at 751-53,

755-57.  *See Rivera v. Ercole*, No. 07 Civ. 3577, 2007 WL 2706274, at

*20 (S.D.N.Y. Sept. 18, 2007)(prosecutor's remarks were not a ground for

habeas relief when they are a proper response to defense counsel's

attack on the credibility of witnesses)(citations omitted).  This claim should

therefore be dismissed.

Finally, petitioner claims that his trial counsel was ineffective for not

objecting to the admission into evidence of a bag/briefcase belonging to

Eleanor Lentz, recovered from Klint's closet and containing petitioner's

identification.  Petitioner claims counsel should have objected because his

prison identification was found inside the bag, and the jury was permitted

to draw adverse and impermissible conclusions from the identification.

While there was testimony that petitioner's identification was found inside

the bag, there was no testimony that it was a prison identification.  Trial Tr.

at 513-15, 614, 620-21, 629.  In any event, when the prosecutor offered

the bag and its contents into evidence, trial counsel did in fact object to its

admission, although on a different ground, arguing that the bag had been

locked in an office before it was submitted to an evidence locker, and law

enforcement officers had commingled it with other items in the room. Trial

Tr. at 649-50.  The court overruled that objection.  *Id.* at 650.  I cannot say

on the face of this record that trial counsel was ineffective on this ground,

or that petitioner suffered prejudice, and therefore recommend that this

ground be dismissed.

Petitioner's remaining unexhausted claims, in which he asserts that

trial counsel was loyal to the court and not to petitioner, that counsel

issued an unnecessary subpoena to petitioner's wife, and that counsel

failed to investigate the case and prepare a defense, are plainly without

merit.  As noted above, the record demonstrates that trial counsel

vigorously represented petitioner by filing appropriate motions, making

appropriate arguments, and even supporting petitioner's many attempts to make a record regarding what petitioner considered to be important issues, including allegations of ineffectiveness.  *See*, *e.g.,* Trial Tr. at 353-85, 544-51, 667-69, 712–15; Sent. Tr. at 3-38.   Petitioner's claim that counsel failed to conduct a competent investigation into the case is refuted by the record, which shows that not only was counsel prepared at every stage of the case, but that he presented an alibi defense, and his representation resulted in acquittal of three of the charges.  Trial Tr. at 670-708, 876-77.  Finally, assuming trial counsel issued or caused to be issued a subpoena to petitioner's wife, that action was appropriate under New York's Criminal Procedure Law §610.10 and 610.20(3), which provide for the use of subpoenas to ensure a witness's notice of an appearance and his or her attendance.

In sum, trial counsel's strategy decisions throughout the trial, viewed in their totality rather than in isolation, were not unreasonable under *Strickland*, and his counsel was not ineffective merely because petitioner

86

may have disagreed with his strategy, or because the strategy was partially unsuccessful. *See Minigan v. Donnelly*, No. 01-CV-0026A, 2007 WL 542137, at *22-23 (W.D.N.Y. Feb. 16, 2007)(citing *People v. Benevento*, 91 N.Y.2d at 712, 697 N.E.2d at 587, 674 N.Y.S.2d at 632 (a reviewing court "must avoid confusing true ineffectiveness with mere losing tactics . . . a simply disagreement with strategies, tactics or the scope of possible cross-examination, weighed long after trial, does not suffice."); *Jenkins v. Unger*, 03 cv 1172, 2007 WL 911889, at *6 (N.D.N.Y. Mar. 22, 2007)(Kahn, D.J.)(discussing reluctance to second-guess counsel's trial strategy simply because that strategy was unsuccessful). Petitioner has not established that counsel was ineffective or that he suffered prejudice, in that the outcome would have been different had counsel only listened to petitioner.  Accordingly, I recommend that petitioner's claim that trial counsel was ineffective based upon the fifteen grounds discussed above.

F.     Ground Five: Effectiveness of Appellate Counsel

Petitioner also claims that appellate counsel was ineffective because 1) counsel failed to raise trial counsel's ineffectiveness; 2) counsel failed to raise all but two of the claims petitioner directed him to raise; 3) counsel had previously represented the petitioner, thereby creating a conflict; and 4) counsel did not argue his case, opting instead to permit the appeal to be submitted on the briefs. Dkt. No. 1, at Ground Five.  Respondent argues that these claims are both unexhausted, and without merit.  Dkt. No. 11, 31-33.

Petitioner raised a general claim on direct appeal that his appellate counsel was ineffective.  Pro Se Supp. Br. at i.  The Appellate Division pointed out that this claim could be raised in a state *coram nobis* petition, but went on to find the claim lacking in merit.[12]  *McKinney*, 302 A.D.2d at

_____

[12]     The Fourth Department also found that a challenge to the effectiveness of appellate counsel "may be raised on direct appeal from a judgment of conviction and, with an adequate record, is properly reviewable."  *McKinney*, 302 A.D.2d at 995, 755 N.Y.2d 541.  I note that in so ruling, the Appellate Division cited to the New York Court of Appeals decision in *People v. Vasquez*, 70 N.Y.2d 1, 3, 509 N.E.2d 934, 516 N.Y.S.2d 921 (1987).  *Vasquez*, however, dealt with appointed appellate counsel's failure to follow proper procedures for filing an *Anders* brief (*Anders v. California*, 386 U.S. 738, 744 (1967)).  The Court of Appeals specifically

995, 755 N.Y.2d 541.  As with his claims of trial counsel ineffectiveness,

petitioner did not raise the specific challenges now contained in his

habeas petition in the state courts.

    New York State law makes available a specific procedure, a state

writ of error *coram nobis* petition, for raising a claim that a convicted

defendant's appellate counsel was ineffective.  *People v. Bachert*, 69

N.Y.2d at 598-99, 509 N.E.2d at 321,  516 N.Y.S.2d at 626. *See Hust v.*

*Costello*, 329 F. Supp.2d 377, 379 (E.D.N.Y. 2004); *Jackson v. Moscicki*,

99 Civ. 2427 & 9746, 2000 WL 511642, at *9 (S.D.N.Y. Apr. 27, 2000).  A

*coram nobis* petition is the only vehicle available to a New York convicted

defendant to exhaust a claim that appellate counsel was ineffective for

federal habeas purposes.  *Garcia v. Scully*, 907 F. Supp. 700, 706-707

(S.D.N.Y. 1995).  Despite that available remedy, to date petitioner failed to

raise his ineffective assistance of appellate counsel claims through

---

stated that the procedures to be followed to collaterally attack appellate counsel's
effectiveness - as petitioner is doing here - were detailed in its decision in *People v.*
*Bachert*, 69 N.Y.2d 593, 509 N.E.2d 318, 516 N.Y.S.2d 623 (1987). That procedure
requires a defendant to challenge appellate counsel's ineffectiveness by initiating a
state *coram nobis* proceeding.  *Id.*

petitioning for a writ of error *coram nobis* to the Appellate Division; and,

because there is no time limit for filing a writ of error *coram nobis* in state

court, that avenue is still available to the petitioner.  *Id.* Accordingly,

petitioner's challenges to appellate counsel's effectiveness are

unexhausted. 28 U.S.C. § 2254 (b); *Dorsey,* 112 F.3d at 52.   Because

these unexhausted claims are "plainly meritless," however, *Rhines,* 544

U.S. at 277, I will address them.  28 U.S.C. § 2254 (b)(2)*;  Wheeler,* 2006

WL 2357973, at \*5.

Analysis of an ineffective assistance of appellate counsel claim is

informed by the same considerations as pertain to a claim of ineffective

assistance generally; to prevail on such a claim, a petitioner must

demonstrate that 1) appellate counsel's performance fell below an

objective standard of professional reasonableness; and 2) but for

appellate counsel's "unprofessional errors," the results of the proceedings

would have been different, and as such, the error caused the petitioner to

suffer prejudice.  *Smith v. Robbins*, 528 U.S. 259, 285-86, 120 S. Ct. 746,

764 (2000); *Strickland*, 466 U.S. at 688, 694.  When challenging the effectiveness of appellate counsel, a petitioner must show that his or her appellate attorney "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994), *cert*. *denied* 513 U.S. 820, 115 S. Ct. 81 (1994); *Clark v. Stinson*, 214 F.3d 315, 322 (2d Cir. 2000), *cert. denied* 531 U.S. 1116, 121 S. Ct. 865 (2001).  A petitioner must show more than counsel's failure to raise a non-frivolous argument, as counsel is required to use professional judgment when deciding to concentrate on a few key issues while eliminating weaker arguments, and is not required to advance every argument urged by the petitioner.  *Evitts v. Lucey*, 469 U.S. 387, 394, 105 S. Ct. 830, 835 (1985); *Jones v. Barnes*, 463 U.S. 745, 751-52, 103 S. Ct. 3308, 3313 (1983); *Sellan,* 261 F.3d at 317.  The Sixth Amendment does not require that all colorable state law arguments be raised on direct appeal.  *Sellan,* 261 F.3d at 310.

    In support of McKinney's direct appeal, his appellate counsel filed a

sixty-two page brief in which he advanced five arguments apparently

deemed by him to have the greatest likelihood of success.  Counsel likely

recognized, as analyzed above, that there was no merit to any of

petitioner's claims that his trial counsel was ineffective.  Appellate counsel

cannot be faulted and considered as ineffective for failing to make a

meritless claim.  *See Torres v. McGrath*, 407 F. Supp. 2d 551, 562

(S.D.N.Y. 2006) ("'[f]ailure to make a meritless argument does not amount

to ineffective assistance'") (*quoting Arena*, 180 F.3d at 396).  Although

petitioner claims that he sent appellate counsel a twenty page letter

detailing each additional argument which he believed had merit and

should be raised, counsel was not required to raise every claim urged by

the petitioner.  *Evitts*, 469 U.S. at 394, 105 S. Ct. at 835.

Petitioner further claims that his appellate counsel's representation

of him presented a conflict of interest, since that attorney had previously

represented him in connection with an appeal, which petitioner also did

not feel had been handled correctly.  Petitioner's "conclusory allegations,

without more, are insufficient to create even the appearance of a conflict of interest." *Garfield v. Poole*, 421 F. Supp. 2d 608, 613 (W.D.N.Y. 2006). Even assuming that the fact appellate counsel previously represented him on an appeal would constitute a potential conflict, it is irrelevant because "petitioner cannot show that appellate counsel's representation would have been any different regardless of his affiliation." *Torres v. Strack*, No. 96-CV-0846, 1998 WL 59452, at *7 (N.D.N.Y. Feb. 10, 1998)(Pooler, J.).

Finally, petitioner claims that he suffered prejudice because his counsel did not argue his case in the Appellate Division, opting instead to submit the case on the briefs.  In the Appellate Division, Fourth Department, oral argument is permitted in most criminal appeals, with the exception of those that challenging the severity of a sentence imposed, but is not required.  *See* N.Y. Sup. Ct. App. Div. 4th Dept. R. 1000.11.  In this instance petitioner has failed to allege how the outcome of his appeal would have been different, and that his conviction would have been reversed, had counsel argued the case.  Moreover, the fact that the

93

Appellate Division modified the judgment by vacating the sentences imposed on the grand larceny convictions and remitted the case for re-sentencing flies in the face of any argument that the Appellate Division looked unfavorably upon counsel's decision to submit the case for review on the briefs without oral argument.

Having found no constitutionally significant deficiency in the performance on the part of his attorney, I recommend that petitioner's ineffective assistance of appellate counsel claim be denied.

> G.    Sixth Ground & Excessive Sentence/Cruel and Unusual Punishment

Petitioner next claims that the sentence of twenty years to life, imposed for the burglary convictions and based upon his status as a persistent violent felony offender, was cruel and unusual for two reasons. First, while acknowledging that second degree burglary is classified as a violent felony offense under New York law, McKinney nonetheless contends that being sentenced as a violent felony offender was not constitutional in this case because he was never threatening or physically

94

violent during the course of committing the crimes for which he was convicted.  Dkt. No.1, Addendum 3, Ground Six.  Additionally, McKinney claims that he was not given the minimum sentence possible and that instead the sentence was enhanced based on speculation about other crimes for which he was not convicted.[13]  *Id.*   Respondent counters by arguing that this claim both is not cognizable, and is without merit.  Dkt. No. 11, at 33-35.

This portion of McKinney's petition overlooks the firmly established principle that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir.1992) (*citing Underwood v. Kelly*, 692 F. Supp. 146 (E.D.N.Y. 1988), *aff'd mem.*, 875 F.2d 857 (2d Cir. 1989), *cert denied* 493 US 837, 110 S. Ct. 117 (1989).  Petitioner was convicted of four counts of second degree burglary, class C violent felonies. Trial Tr. at 814-44.  Petitioner had two prior convictions for the very same crime, one

---

[13]   McKinney does not appear to be challenging the sentences imposed for grand larceny and petit larceny.

in 1991 and the other in 1987.  N.Y. PENAL LAW §70.02(1)(b); Sent. Tr.

at 39. Second degree burglary was classified as a violent felony offense in

New York as early as 1978, well before petitioner's 1991 and 1987

convictions for that crime.  *See People v. Morse*, 62 N.Y.2d 205, 214, 476

N.Y.S.2d 505 (1984), *appeal dismissed by Vega v. New York*, 469 U.S.

1186 (1985).  The trial court thus properly determined that petitioner was a

persistent violent felony offender, based upon these two prior violent

felony convictions and the fact that he was again convicted of the same

violent felony offense.  Sent. Tr. at 39. *See* N.Y. PENAL LAW §70.08

(1)(a).  Under New York law, the authorized sentence for a persistent

violent felony offender carries a minimum range of between sixteen years

and twenty-five years, with a mandatory maximum sentence of life in

prison.  N.Y. PENAL LAW §70.08(2), (3)(b).  The sentence imposed in this

instance, twenty years to life in prison on each count of second degree

burglary, was well within that range.

        Based upon these circumstances the Appellate Division correctly

96

concluded that the lower court properly sentenced the petitioner as a

persistent violent offender.  *See McKinney*, 302 A.D.2d at 994, 755

N.Y.S.2d 541.  I note, moreover, that although the trial court could have

ordered that the four sentences run consecutively, since the crimes for

which he was convicted were not the result of a single act, but rather

constituted four distinct crimes, the court instead exercised its discretion

and ordered all of the sentences to run concurrently.  *See* N.Y. PENAL

LAW §70.25; *People v. Walsh*, 44 N.Y.2d 631, 484 N.E.2d 126, 407

N.Y.S.2d 97 (1985).

Petitioner alleges that the state court improperly based its sentence

upon uncharged crimes for which he was not convicted.  "[A]t sentencing,

'the judge may consider hearsay, evidence of uncharged crimes, dropped

counts of an indictment, and crimes charged that resulted in acquittal."

*Jones v. Donnelly*, 487 F. Supp. 2d 403, 416 (S.D.N.Y. 2007)(*quoting*

*Arocho v. Walker*, No. 01-CV-1367, 2001 WL 856608 at *4 (S.D.N.Y. July

27, 2001).  Contrary to petitioner's argument, however, the record shows

that the state court based its sentence not solely upon petitioner's prior convictions, or on speculation concerning uncharged crimes, but rather on the crimes for which he was convicted.  When passing sentence, the court observed that "one of the most serious crimes that someone can commit is knowingly and unlawfully entering into someone's home."  Sent. Tr. at 40.  Judge Aloi went on to explain that petitioner made his victims feel unsafe in their own homes.  *Id.*  While the court noted that petitioner had been involved "in these kinds of crimes for many years" and it was apparent that petitioner "continued to commit these crimes after being released from prison," that remark was amply supported by petitioner's convictions in this case. Sent. Tr. at 40.  The Appellate Division's rejection of this claim was therefore neither contrary to nor an unreasonable application of clearly established federal law, and this ground of the petition should be denied.

McKinney also claims that his sentence constitutes cruel and unusual punishment, in violation of the Eighth Amendment.  That

amendment, however, forbids only extreme sentences which are "grossly disproportionate" to the crime of conviction.  *Lockyer v. Andrade*, 538 U.S. 63, 72-73, 123 S. Ct. 1166, 1172-73 (2003); *Harmelin v. Michigan*, 501 U.S. 957, 995, 111 S. Ct. 2680, 2701 (1991). It is well-established that a sentence of imprisonment that is within the limits of a valid state statute is not cruel and unusual punishment in the constitutional sense.  *See White*, 969 F.2d at 1383; *Lou v. Mantello*, No. 98-CV-5542, 2001 WL 1152817, at *13 (E.D.N.Y. Sept. 25, 2001).  The Supreme Court has held that, even for certain offenses less serious than manslaughter, sentences of incarceration for longer than twenty-five years are not grossly disproportionate.  *See Staubitz v. Lord*, 03 CV 0671, 2006 WL 3490335, at *2 (E.D.N.Y. Dec. 1, 2006)(*citing Ewing v. California*, 538 U.S. 11, 123 S. CT. 1179 (2003)(twenty-five years to life for grand theft) and *Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680 (1991)(life in prison without the possibility of parole for cocaine possession).  McKinney's sentence thus did not run afoul of the Eighth Amendment's prohibition against cruel and

unusual punishment.

In sum, since the sentence imposed was plainly within the limits authorized by statute, and was not grossly disproportionate to the crime of conviction, this ground of McKinney's petition should be denied.

IV.    SUMMARY AND RECOMMENDATION

The vast majority of the arguments now raised by the petitioner were presented to and rejected by the state courts.  Having carefully reviewed the record, applying the requisite deferential standard, I am unable to conclude that any of the state court's determinations were either clearly erroneous or represent unreasonable applications of clearly established Supreme Court precedent.  Certain of McKinney's fifteen claims that trial counsel was ineffective are either "deemed exhausted" and procedurally barred, or are unexhausted; in any event, each is without merit. McKinney's three claims of appellate counsel ineffectiveness are unexhausted, but plainly meritless. It is therefore hereby

RECOMMENDED, that the petition in this matter be DENIED and

dismissed in all respects, and it is further hereby

RECOMMENDED, based upon my finding that McKinney has not

made a "substantial showing of the denial of a constitutional right" pursuant

to 28 U.S.C. § 2253(c)(2), that a certificate of appealability not issue with

respect to any of the claims set forth in his petition.

Pursuant to 28 U.S.C. §636 (b)(1), the parties have ten (10) days

within which to file written objections to this report.  Such objections shall

be filed with the Clerk of the Court.  FAILURE TO OBJECT TO THIS

REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE

REVIEW.  28 U.S.C. §636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roldan v.

Racette*, 984 F.2d 85 (2d Cir. 1993).

It is further ORDERED that the Clerk of the Court serve a copy of this

report and recommendation upon the parties electronically.


Dated:      January 29, 2008
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge

101